# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2017

Lyle W. Cayce
Clerk

No. 15-41396

In the Matter of: DALLAS ROADSTER, LIMITED; IEDA ENTERPRISES, INC.

> Debtors

TEXAS CAPITAL BANK N.A.,

> Appellee-Cross-Appellant-Cross-Appellee

v.

DALLAS ROADSTER, LIMITED,

> Appellant-Cross-Appellee

IEDA ENTERPRISE, INCORPORATED; BAHMAN KHOBAHY

> Cross-Appellees

BAHMAN HAFEZAMINI

> Cross-Appellee-Cross-Appellant

Appeals from the United States District Court
for the Eastern District of Texas

Before KING, OWEN, and HAYNES, Circuit Judges.

KING, Circuit Judge:

No. 15-41396

This case comes to us after more than five years of litigation over loan agreements between a bank and a used car dealership. The borrower, Dallas Roadster, Limited, sought damages, and the lender, Texas Capital Bank N.A., sought certain attorneys' fees after receiving full payment on the loans through the borrower's bankruptcy proceedings. Each contends that the other breached the loan agreements. Following a four day bench trial on the breach of contract issues, the district court issued take-nothing judgments on the borrower's and lender's claims. Both the borrower and the lender appealed, as did one of the borrower's guarantors, who challenges the grant of summary judgment dismissing his counterclaims against the lender. For the following reasons, we AFFIRM in part, VACATE in part, and REMAND.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dallas Roadster, Limited ("Roadster"), which operates a used car dealership, executed several loan agreements with Texas Capital Bank N.A. ("TCB"). While the business relationship proved profitable for both parties over the course of several years, it ended when TCB declared that events of default had occurred, accelerated the outstanding balances on the loans, and sought an ex parte receivership in state court. TCB's actions coincided with a raid by the Drug Enforcement Administration ("DEA") of Roadster and the arrest of Roadster's CEO, Bahman Hafezamini, on money laundering charges.

### A. The Contracts

In 2008, TCB and Roadster executed promissory notes evidencing: (1) a $4 million loan that Roadster could use on a revolving basis for purchasing inventory ("Floor Plan Note"); and (2) an approximately $2 million loan that Roadster used to refinance its real estate ("Real Estate Note"). The maturity date of the revolving loan was extended by agreement of the parties several times. As relevant here, the loan was scheduled to mature on December 15, 2011.

2

No. 15-41396

In connection with the Floor Plan Note, TCB and Roadster also executed a Loan and Security Agreement ("Floor Plan Loan Agreement"). Hafezamini (Roadster's CEO), Bahman Khobahy (Roadster's President), and IEDA Enterprise, Inc. (a Texas corporation that is the general partner of Roadster and is owned 50% by Hafezamini and 50% by Khobahy) each executed an unlimited guaranty agreement. The Floor Plan Loan Agreement set out various requirements and rights. For example, in § 7.2(o), Roadster agreed to a "Change of Ownership or Control" clause, which provided that Roadster would not "[p]ermit any change in the ownership or control of Borrower, or permit the sale, transfer or conveyance of any shares or other interest in Borrower" without the prior written consent of TCB. Additionally, § 7.1(a) required Roadster to "[a]t all times maintain full and accurate books of account and records" and furnish to TCB certain financial statements and certificates of compliance. Specifically, Roadster was obligated to certify after each calendar quarter that it was in full compliance with each of the covenants in the Floor Plan Loan Agreement and that there were no events of default.

Relevant to this appeal, the Floor Plan Loan Agreement also contained an "Events of Default and Remedies" section, which listed fifteen events of default. The occurrence and continuance of an event of default would allow TCB to exercise various remedies. Although during the period at issue, there may have been other events of default, the primary focus here is on two of the fifteen events: § 9.1(n) – if TCB, "in good faith, shall deem itself insecure," and § 9.1(o) – if Roadster or any of its guarantors "suffers a material adverse change in its business or financial condition." The Floor Plan Loan Agreement provided various default remedies that TCB could exercise if an event of default occurred. For example, TCB could accelerate the outstanding balance immediately and seek the appointment of a receiver.

3

No. 15-41396

The Floor Plan Loan Agreement also included a non-waiver clause, which stated, in part, that no waiver "shall ever be effective unless it is in writing and signed by" TCB. Additionally, the Floor Plan Loan Agreement contained covenants requiring Roadster to pay TCB's expenses and attorneys' fees under certain circumstances.[1]

In connection with the Real Estate Note, TCB and Roadster also executed a Loan and Security Agreement ("Real Estate Loan Agreement") and a Deed of Trust. Similar to the Floor Plan Loan Agreement, the Real Estate Loan Agreement contained various obligations on the part of Roadster, a list of events of default, and remedies that TCB could exercise. Moreover, the Real Estate Loan Agreement included a "cross-default" provision, which stated that a default under any other loan agreement between TCB and Roadster, such as the Floor Plan Loan Agreement, would also constitute an event of default under the Real Estate Loan Agreement.

## B. DEA Investigation

In September 2010, the DEA notified TCB that it was investigating Roadster and Hafezamini, among others. As part of the investigation, the DEA conducted four undercover operations in which government agents purchased vehicles from Roadster, each time using more than $10,000 in cash. Although

---

[1] For example, § 7.1(h) stated that Roadster agreed to "pay all reasonable costs and expenses incurred by or on behalf of Lender (including attorneys' fees) in connection with . . . (iv) the defense or enforcement of the Loan Documents, and (v) the defense or enforcement of the Loan Documents and the amendment, restructuring or 'workout' of any of the Loan Documents." The Floor Plan Loan Agreement also included a "General Indemnity" clause, which stated, in part, that "Borrower promises to indemnify Lender, upon demand, from and against any and all liabilities, obligations, claims, . . . suits, costs, expenses or disbursements of any kind or nature whatsover which may be imposed on, incurred by, or asserted against Lender . . . (whether or not caused by any negligent act or omission of any kind by Lender) growing out of or resulting from the Loan Documents and the transactions and events at any time associated therewith (including without limitation the enforcement of the Loan Documents and the defense of Lender's actions and inactions in connection with the Revolving Loan)." (Emphasis in the original.)

Roadster was required to file a form with the Internal Revenue Service anytime more than $10,000 in cash was used for a purchase, Roadster failed to do so after each of these undercover purchases.

Throughout the investigation, TCB cooperated with and was regularly kept up to date by the DEA. For example, after the first undercover purchase, the DEA met with TCB to review a large cash deposit by Roadster. The DEA also communicated with TCB about potential arrests. For example, on November 9, 2011, the DEA emailed TCB that a federal grand jury had indicted Hafezamini on money laundering charges and that the DEA intended to implement searches and arrests on November 16, 2011. The next day, the DEA met with and told TCB that a search of Roadster would occur on November 16, 2011.

On November 16, 2011, the DEA executed its search warrants and seized books, records, computer equipment, and currency from Roadster. Hafezamini was also arrested on November 16. His indictment was later dismissed after he agreed to a pretrial diversion agreement in July 2012.

**C. TCB's Actions After Becoming Aware of the DEA Investigation**

In late 2010, after being alerted to the DEA investigation, TCB started to take steps to protect itself. Specifically, TCB hired a monitor who conducted daily audits on Roadster's premises. TCB also asked Roadster to start looking for alternative financing, a prompt that may also have been occasioned in part by the approaching maturity date of the Floor Plan Note. At least by late June 2011, TCB had retained counsel to prepare for the filing of a receivership. During this time, however, Roadster continued to operate efficiently. Indeed,

No. 15-41396

an email from a TCB employee in May 2011 recognized that "Dallas Roadster appears to be operating more efficiently than ever."[2]

On October 26, 2011, TCB sent a Notice of Default to Roadster, IEDA, Hafezamini, and Khobahy claiming that Roadster was in default under the loan agreement because Roadster had sought financing from Automotive Finance Corporation ("AFC"). TCB requested that Roadster notify it in writing if Roadster had not entered into a financing agreement with AFC. Although Roadster did not respond to TCB in writing, Roadster did inform representatives of TCB in person that it had not entered into a credit facility with AFC.[3]

On November 15, 2011, the day before the DEA raided Roadster and arrested Hafezamini, TCB sent a Notice of Acceleration and Notice of Cross-Default and Acceleration to Roadster, IEDA, Hafezamini, and Khobahy. The letter was not actually delivered until the next day, November 16. In the letter, TCB once again based its default claim on Roadster's pursuit of alternative financing from AFC. Additionally, TCB cited two other events of default under the Floor Plan Loan Agreement as independent grounds for exercising its default remedies: § 9.1(n) (when TCB, in good faith, deems itself insecure), and

---

[2] On June 22, 2011, TCB and Roadster had executed a covenant default forbearance agreement. Roadster had failed to submit required financial statements to TCB, and in consideration of TCB's forbearance of exercising its rights on default, Roadster and its guarantors agreed to "release, relinquish and forever discharge [TCB] . . . from any and all claims, demands, actions and causes of actions of any and every kind or character, whether known or unknown, equitable or legal, present or future of whatever kind, nature and description, that now exist or that might hereafter arise, based upon any act, event or relationship occurring or existing at any time through the date this letter is executed and relating in any manner to the extension, negotiation or administration of the Loan."

[3] Roadster had signed a Demand Promissory Note and Security Agreement with AFC. The district court found that TCB could not rely on any agreement between Roadster and AFC as a prior material breach committed by Roadster because TCB "knew about it and continued to accept payments, continued to accept the contract as ongoing, and then insisted on performance by [Roadster]." As we have noted, the Floor Plan Loan Agreement contains a non-waiver provision which the district court did not acknowledge or address in its ruling.

§ 9.1(o) (when Roadster or any guarantor suffers a material adverse change in its business or financial condition).  The letter concluded that this was not intended to be an exhaustive list of potential events of default.

On November 16, 2011, soon after the DEA raid had begun, TCB filed its Original Petition and Emergency Application for Appointment of a Receiver in Texas state court against Roadster and its guarantors (IEDA, Hafezamini, and Khobahy).  The suit alleged (1) default under the Floor Plan Note, (2) breach of contract, (3) liability on the guaranties, and (4) entitlement to attorneys' fees.  Additionally, as part of the emergency application for receivership, TCB "request[ed] that the Court appoint a receiver to take control of and manage the property . . . and to provide for an orderly liquidation of the Personal Property to satisfy the outstanding indebtedness under the Loan Documents and in accordance with [TCB's] rights under the same."  Under Dallas County local rules, TCB was required to provide Roadster with notice of the ex parte application at least two hours before it was filed.  However, apparently invoking an exception to the local rules, TCB did not provide Roadster with notice because TCB's attorney declared that notice "would impair or annul the court's power to grant relief because the subject matter of the Application could be accomplished or property removed, secreted or destroyed, if notice were required."

Accompanying the Original Petition and Emergency Application for Appointment of a Receiver was an affidavit from Paul Noonan, a senior vice president at TCB.  The Texas state court granted the ex parte application soon after it was filed.  Notably, after the bench trial, the district court found that Noonan's affidavit contained a number of false statements.[4]

---

[4] TCB disputes that this affidavit was false.

No. 15-41396

## D. Bankruptcy and Adversary Proceedings

Roadster did not appeal the receivership. Instead, on December 12, 2011, Roadster filed for Chapter 11 bankruptcy.[5] On December 20, 2011, the bankruptcy court entered an agreed order requiring the receiver to return to Roadster the assets in the receiver's custody.

### i. Bankruptcy Court Proceedings

In December 2012, TCB's state court action was removed to the bankruptcy court, commencing an adversary proceeding. In July 2013, Roadster, IEDA, Khobahy, and Hafezamini each filed an answer and counterclaims against TCB.

In October 2013, the bankruptcy court confirmed Roadster's third amended plan of reorganization ("Confirmed Plan"), and the adversary proceeding was withdrawn to federal district court. The Confirmed Plan resolved all remaining disputes over Roadster's outstanding loan balance,[6] as well as (1) all of TCB's pre-petition attorneys' fees and expenses, and (2) the fees and expenses incurred in connection with the bankruptcy case after the bankruptcy petition was filed. However, the Confirmed Plan specifically carved out the "post-petition litigation fees and expenses" related to this litigation and stated that it was not affecting TCB's right to pursue these fees.

### ii. Summary Judgment

In the district court, TCB filed a First Amended Complaint. The complaint clarified that TCB sought only its post-petition attorneys' fees, which were carved out of the Confirmed Plan. At this stage of the litigation, the following claims remained: (1) TCB's claims for breach of contract against

---

[5] IEDA also filed for bankruptcy the same day.

[6] Roadster had already paid off the Floor Plan Note. Between December 2011 and February 2012, Roadster agreed to liquidate a portion of its inventory in order to pay off the Floor Plan Note.

No. 15-41396

Roadster and its guarantors (IEDA, Khobahy, and Hafezamini) seeking to recover its post-petition attorneys' fees;[7] (2) Roadster's various counterclaims against TCB, including breach of contract;[8] (3) Khobahy's various counterclaims against TCB;[9] and (4) Hafezamini's various counterclaims against TCB.[10]

In March 2015, the magistrate judge issued a report and recommendation on TCB's motion for summary judgment and Roadster's partial motion for summary judgment.[11] The magistrate judge recommended that TCB's summary judgment motion be granted as to all of Hafezamini's, Khobahy's, and Roadster's claims except for Roadster's breach of contract claim. The magistrate judge recommended that Roadster's partial summary judgment motion be denied. Thus, the only claims that would survive after

---

[7] TCB alleged causes of action for (1) breach of contract against Roadster for post-petition attorneys' fees; (2) breach of the guaranties against IEDA, Khobahy, and Hafezamini for post-petition attorneys' fees; and (3) breach of contract and the guaranties against Khobahy and Hafezamini for failure to indemnify TCB against the counterclaims.

[8] Roadster alleged causes of action for (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) wrongful receivership; and (5) declaration of common law partnership or its equivalent.

[9] Khobahy alleged causes of action for (1) breach of contract; (2) tortious interference with existing contract and prospective relations; (3) wrongful receivership; (4) conversion; (5) fraud; (6) intentional infliction of emotional distress; (7) negligent misrepresentation; (8) defamation/business disparagement; (9) promissory estoppel; (10) unjust enrichment; (11) money had and received; (12) violation of the Texas Theft Liability Act; and (13) violation of the Equal Credit Opportunity Act.

[10] Hafezamini alleged causes of action for (1) malicious prosecution of civil and/or criminal proceedings; (2) abuse of process; (3) intentional infliction of emotional distress; (4) tortious interference with existing contracts and prospective relations; (5) fraud / fraud in the inducement / violation of the Deceptive Trade Practices Act; (6) promissory estoppel; (7) wrongful receivership; and (8) violation of the Equal Credit Opportunity Act. Additionally, Hafezamini adopted the causes of action alleged by Roadster.

[11] TCB also had filed motions to dismiss against the claims asserted by Roadster, Hafezamini, and Khobahy that were still pending at the time of this decision. The parties agreed before the magistrate judge that a ruling on the summary judgment motions would moot the pending motions to dismiss.

summary judgment were TCB's breach of contract claims for attorneys' fees and Roadster's breach of contract counterclaim.

TCB, Roadster, Khobahy, and Hafezamini each filed objections to the magistrate judge's report and recommendation. Reviewing the objections de novo, the district court adopted in full the magistrate judge's report and recommendation.[12]

*iii. Bench Trial*

In August 2015, the district court conducted a four day bench trial, ultimately entering take-nothing judgments on TCB's and Roadster's remaining claims. Unsurprisingly, Roadster's and TCB's narratives at trial of the events leading up to the bankruptcy differed sharply. In short, TCB contended that it simply took remedial steps that were allowed under the Floor Plan Loan Agreement and the Real Estate Loan Agreement. According to TCB, there were multiple events of default, and the Floor Plan Loan Agreement specifically granted TCB the option of accelerating the balances of the loans and obtaining a receivership if an event of default occurred. Roadster countered, however, that it was over-collateralized, TCB's interests were never in jeopardy, and no event of default had occurred that would justify TCB accelerating the loan and seeking an ex parte receivership. Rather, according to Roadster, TCB saw an opportunity to exit the loan agreements and used bad

---

[12] Shortly after this order was issued, the case was transferred to a different district judge. In August 2015, the new district judge issued an order "[t]o streamline the presentation of evidence at trial" by "clarif[ying] the rulings on" the parties' objections to the magistrate judge's report and recommendation. Besides clarifying the reasoning for overruling certain objections, the district court primarily clarified that the guarantors "guaranteed [Roadster's] performance, not TCB's bad actions. If, at trial, TCB is found responsible to [Roadster] for its bad acts, and if TCB is found to have materially breached the loan documents before [Roadster] materially breached the applicable loan documents, then [Khobahy and Hafezamini], as guarantor[s], would not have to reimburse TCB for its own bad acts."

faith tactics to do so. In an oral ruling,[13] the district court largely agreed with Roadster regarding TCB's bad faith actions. For example, the district court found that TCB "acted in bad faith and outside of reasonable legitimate activity in asking for and obtaining an order for the receiver to liquidate." The district court added that it was "actually somewhat stunned" that TCB's witnesses were claiming that the receivership was not for the purpose of liquidation and that the witnesses "would be repeating this [claim] over and over again to a federal judge." The district court also noted "evidence of connivance with the receiver" and specifically found that TCB "and the receiver acted outside of all reasonable legitimate activity in the operation of the receivership, given the law dealing with receiverships."[14]

After making its findings relating to the bad faith actions of TCB, the district court held that, although § 7.1(h) and § 9.6 of the Floor Plan Loan Agreement "allow recovery" of TCB's attorneys' fees, those clauses were unenforceable under these circumstances. Specifically, the district court conducted an "*Erie* analysis" of how the Texas Supreme Court's decision in *Zachry Construction Corp. v. Port of Houston Authority*, 449 S.W.3d 98 (Tex. 2016), would apply to the contract provisions and facts of this litigation. The district court determined "that a Texas court would hold that [a] broad-sweeping indemnification clause or broad attorneys' fees clause [is] unenforceable when it leads to the injured party having to indemnify the wrongdoer for the injuring party's own deliberate and intentional wrongdoing."

---

[13] The district court also issued two exhibits containing factual findings and an order supplementing the oral ruling regarding the attorneys' fees sought by TCB.

[14] The district court described the receiver's actions as follows: "I find that [the receiver] was trying to liquidate and not attempting to run [Roadster] in the ordinary course of business, not attempting to maximize—and understanding that [the receiver] was told to liquidate, but [the receiver] wasn't doing the job a receiver should do under anything other than a fire sale liquidation-type regime."

Alternatively, the district court denied recovery of attorneys' fees using its inherent power, reasoning that "when litigation is instigated or conducted in bad faith or there's been willful abuse of the judicial process, that meets th[e] stringent standards" for the use of a district court's inherent power to sanction TCB.

Although the district court denied TCB's claims for attorneys' fees, the district court also denied Roadster's breach of contract claim because it found that Roadster had materially breached the Floor Plan Loan Agreement prior to TCB's alleged breaches.  Specifically, the district court found that Roadster had accepted other loans from various individuals and failed to report these outstanding loans on the financial statements and certificates of compliance that it was required to periodically provide to TCB.  After weighing the factors articulated under Texas law for determining whether a breach is material, *see Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004), the district court determined that these inaccurate financial statements and certificates of compliance constituted a material breach.  Additionally, the district court found that Roadster breached the Floor Plan Loan Agreement by permitting a change in its ownership when it accepted an investment of nearly $1 million dollars from an individual named Alberto Dal Cin.  The district court similarly found that this breach was material.

On September 28, 2015, Roadster filed a motion for reconsideration, arguing that any prior breach was not material.  Roadster argued primarily that TCB failed to adequately brief the affirmative defense of a prior material breach, and this lack of briefing led the district court to misapply the five factors under Texas law for determining whether a breach is material.  *See Mustang Pipeline*, 134 S.W.3d at 199.  Roadster then addressed each of the *Mustang* factors and, with respect to the first factor, argued that the district court erred by considering whether TCB was deprived of the benefit of the

specific provision that was breached rather than the benefit of the overall purpose of the contract.  On October 14, 2015, the district court denied Roadster's motion for reconsideration.  The district court rejected Roadster's argument that TCB's material breach defense was inadequately briefed. Rather, the district court found that it was actually Roadster who did not address all of the *Mustang* factors: "In essence, [Roadster's] only response to [TCB's] 'material breach' defense was that because [TCB] 'received the benefit of its loan bargain, and more: a successful and profitable loan which it renewed and extended several times over a twelve year period, while being over-secured by more than twice as much collateral as debt . . . .'"  The district court also held that it did not misapply the *Mustang* factors and declined to address Roadster's arguments regarding the other *Mustang* factors, in addition to the benefit of the bargain argument, because Roadster had failed to make those arguments prior to the final judgment.

Roadster, Hafezamini, and TCB each timely filed a notice of appeal.

## II.  HAFEZAMINI'S APPEAL

We first turn to Hafezamini's appeal of the district court's grant of summary judgment dismissing all of his counterclaims.  "A grant of summary judgment is reviewed *de novo*, applying the same standard on appeal that is applied by the district court." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 244 (5th Cir. 2006)).  Summary judgment is appropriate if there is no "genuine dispute as to any material fact." *Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 250 (5th Cir. 2012) (quoting Fed. R. Civ. P. 56).  "When reviewing a grant of summary judgment, we review the facts drawing all inferences most favorable to the party opposing the motion." *Id.*  "We may affirm on any ground raised below and supported by the record, even if the district court did not

reach it." *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 810 (5th Cir. 2016).

On appeal, Hafezamini challenges the grant of summary judgment on only five of his claims: (1) tortious interference with existing contract; (2) tortious interference with prospective business relations; (3) abuse of process; (4) malicious civil prosecution; and (5) malicious criminal prosecution. The district court, adopting the magistrate judge's recommended findings and conclusions, granted summary judgment because Hafezamini waived his claims as part of a broad release, and alternatively, each of his claims failed on the merits. Because we find that the appealed claims fail on their merits, we do not reach the question of whether Hafezamini's release is valid in light of *Zachry*.

## A.   Tortious Interference with Contract and with Prospective Business Relations

Hafezamini appears to appeal the grant of summary judgment on both his tortious interference with contract claim and his tortious interference with prospective business relations claim, although he does not distinguish between the two claims and instead refers to a single "tortious interference" claim. The magistrate judge had recommended that the tortious interference with contract claim should fail because Hafezamini's evidence, his own declaration, did "not sufficiently describe how and to the extent he was damaged." The magistrate judge had concluded that the tortious interference with prospective business relations claim should also fail because Hafezamini did not show that TCB had committed an independent tort.

To succeed on a claim for tortious interference with contract, the plaintiff must show "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins.*

No. 15-41396

*Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). To succeed on a claim for tortious interference with prospective business relations, the plaintiff must show "(1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Here, Hafezamini's claims fail for multiple reasons. On the tortious interference with contract claim, Hafezamini failed to show the existing contract that was subject to interference and how TCB interfered with that contract. Hafezamini's brief states that the contract "is undisputed," but it is far from clear to what contract he is referring. Based on the context of the surrounding argument, it appears that he is referring to the financial contracts with TCB, but TCB cannot tortiously interfere with its own contracts. *See, e.g.*, *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 430 (Tex. App.—Waco 1997, writ denied). While Hafezamini does claim to have lost out on other business deals and been forced to sell his business interest in Azar Capital Investments, a separate entity with which Hafezamini was associated, his conclusory declaration fails to create a genuine dispute of material fact regarding the existence of a contract that was subject to interference and how TCB's actions caused that interference.[15] *See Young v. Equifax Credit Info. Servs., Inc.*, 294

---

[15] Hafezamini also argues that TCB urged Khobahy to stop working with Hafezamini as a business partner. Once again, however, Hafezamini fails to identify the existing contract that was allegedly subject to interference. Based on a review of Hafezamini's objections to

F.3d 631, 639 (5th Cir. 2002) ("Conclusory affidavits are not sufficient to defeat a motion for summary judgment."). For the prospective business relations claim, Hafezamini once again relies on his inadequate and conclusory declaration. Moreover, Hafezamini has pointed to no evidence that TCB's conduct would be actionable under a recognizable tort. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); *see also S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 537–38 (5th Cir. 2003). Accordingly, summary judgment was properly granted on Hafezamini's tortious interference claims.

## B.  Abuse of Process

Hafezamini also appeals the grant of summary judgment on his abuse of process claim. To succeed on an abuse of process claim, the plaintiff must show the following three elements: (1) "the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process;" (2) "the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process;" and (3) "damage resulted to the plaintiff as a result of such illegal act." *Liverman v. Payne-Hall*, 486 S.W.3d 1, 5 (Tex. App.—El Paso 2015, no pet.) (quoting *Blanton v. Morgan*, 681 S.W.2d 876, 878 (Tex. App.—El Paso 1984, writ ref'd n.r.e.)). Critically, "[t]he focus is on the use of the process once it is properly obtained, not on the motive for originally obtaining the process." *Davis v. West*, 433 S.W.3d 101, 110–11 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Additionally, "[t]he process must be used to 'compel a party to do a collateral thing which he would

---

the magistrate judge's report and recommendation, it appears that the claim is premised on TCB allegedly urging Khobahy to drop Hafezamini from the loan agreements that they had with TCB. However, as already discussed, TCB cannot interfere with its own contract. *See, e.g.*, *Delta Air Lines*, 949 S.W.2d at 430. To the extent that Hafezamini is alleging that future business dealings were interfered with, Hafezamini has failed to identify what those prospective business relations were or an independently tortious act.

not be compelled to do' otherwise." *Id.* at 111 (alteration omitted) (quoting *Detenbeck v. Koester*, 886 S.W.2d 477, 480 (Tex. App.—Houston [1st Dist.] 1994, no writ)).

Here, summary judgment was properly granted on Hafezamini's abuse of process claim.[16]   Hafezamini's allegations are improperly based on TCB's conduct in obtaining the ex parte receivership, not in any abuse after the receivership was granted. *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.— Houston [14th Dist.] 1994, writ denied) ("It is critical to a cause of action for abuse of process that the process be improperly used *after* it has been issued. If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution."). Thus, Hafezamini's abuse of process claim fails for that reason.

On appeal, Hafezamini belatedly attempts to use a finding made by the district court after the bench trial—that "[TCB] and the receiver acted outside of all reasonable legitimate activity in the operation of the receivership, given the law dealing with receiverships"—as a ground for why his claim should have survived summary judgment. But this finding was made in the context of determining whether TCB was entitled to attorneys' fees in light of *Zachry* and not in the context of whether there is a genuine factual dispute supporting Hafezamini's abuse of process claim. In any event, Hafezamini's summary judgment briefing did not argue that his abuse of process claim was premised on TCB's conduct after the receivership was granted nor did his briefing point to any evidence supporting that argument. Moreover, Hafezamini's objections to the magistrate judge's report and recommendation on this issue only contained the bare allegation that TCB's motive was "recover[ing] the

---

[16] Although the district court potentially erred by conflating an abuse of process claim with a malicious criminal prosecution claim, we affirm on other grounds. *See Williams*, 826 F.3d at 810.

hundreds of thousands of dollars that TCB had spent in auditors and legal analysis, which weren't recoverable under typical 'exit plans,'" which again does not amount to an argument that TCB's actions after the receivership was granted supported his abuse of process claim.  Even if Hafezamini's complaint could be interpreted as alleging that the abuse of process claim is based on the operation of the receivership, Hafezamini's claim would still fail because he did not present evidence that TCB misused the receivership in order to compel Hafezamini to act in a collateral way.  *See Davis*, 433 S.W.3d at 111–12 ("[Plaintiff] presented no evidence that [Defendant] misused process to compel [Plaintiff] to act in a collateral way; rather, the only evidence is that the process was used to satisfy the debt.").

## C.  Malicious Civil and Criminal Prosecution

Finally, Hafezamini appeals the grant of summary judgment on his malicious civil and criminal prosecution claims.  With respect to the malicious civil prosecution claim, the district court found that Hafezamini abandoned the claim by failing to include any argument about the claim in his response to TCB's motions to dismiss and for summary judgment.  On appeal, Hafezamini argues that this finding was incorrect because he included arguments about malicious criminal prosecution, and according to Hafezamini, Texas courts do not distinguish between civil and criminal malicious prosecution claims.  But there is a very clear distinction between civil and criminal malicious prosecution claims under Texas law: malicious civil prosecution concerns the institution of a civil proceeding and malicious criminal prosecution concerns the commencement of a criminal prosecution.  *Compare Airgas-Southwest, Inc. v. IWS Gas & Supply of Tex., Ltd.*, 390 S.W.3d 472, 478 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (listing the elements for malicious civil prosecution), *with Kroger Tex. Ltd. v. Suberu*, 216 S.W.3d 788, 792 n.3 (Tex. 2006) (listing the elements for malicious criminal prosecution).  In fact,

Hafezamini's complaint recognizes this distinction by describing both a civil action (the state court receivership) and a criminal action (the federal criminal charges against him). Yet, Hafezamini's oppositions to the motions to dismiss and for summary judgment contained arguments only about the malicious criminal prosecution claim. Thus, Hafezamini abandoned his malicious civil prosecution claim. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006).

Turning to the malicious criminal prosecution claim, Hafezamini must show that "(1) a criminal prosecution was commenced against him; (2) the defendant initiated or procured that prosecution; (3) the prosecution terminated in his favor; (4) he was innocent of the charges; (5) the defendant lacked probable cause to initiate the prosecution; (6) the defendant acted with malice; and (7) he suffered damages." *Martinez v. English*, 267 S.W.3d 521, 527–28 (Tex. App.—Austin 2008, pet. denied). The district court found that Hafezamini had not created a genuine fact issue as to the fourth element: his innocence of the charges brought against him. Without reaching that issue, we affirm because Hafezamini has failed to create a genuine fact issue as to the second element: whether TCB initiated or procured his prosecution.

Here, it is undisputed that it was the DEA that first approached TCB about Hafezamini as part of an ongoing investigation. This investigation was prompted by a confidential source, not TCB. And the eventual arrest of Hafezamini was based on four undercover operations by the DEA. Although TCB did lend assistance to the investigation, there is no evidence supporting the contention that TCB "procured" the criminal prosecution. *See King v. Graham*, 126 S.W.3d 75, 76 (Tex. 2003) ("[P]roof that a complainant has knowingly furnished false information is *necessary* for liability when the decision to prosecute is within another's discretion. But such proof is not *sufficient*. *Lieck* also requires proof that the false information 'cause[d] a

criminal prosecution.' In other words there must be proof that the prosecutor acted based on the false information and that but for such false information the decision would not have been made." (footnote omitted) (quoting *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 292 (Tex. 1994))). At best, Hafezamini's allegation is that TCB failed to provide the DEA with favorable information about Hafezamini. But this bare allegation is insufficient to show that TCB "procured" the criminal prosecution, and there is no evidence that TCB's statements caused the indictment (which, again, was supported by four undercover operations conducted by the DEA). *See Gonzalez v. Grimm*, 479 S.W.3d 929, 937–38 (Tex. App.—El Paso 2015, no pet.). Accordingly, the district court properly granted summary judgment on Hafezamini's malicious criminal prosecution claim.

In sum, the district court did not err in granting TCB's summary judgment motion on Hafezamini's counterclaims.

## III. ROADSTER'S APPEAL

We next address Roadster's appeal of the district court's take-nothing judgment on its breach of contract claim. Because Roadster's appeal requires the review of the district court's ruling following a bench trial, we review the district court's findings of fact for clear error and legal issues de novo. *Lehman v. GE Glob. Ins. Holding Corp.*, 524 F.3d 621, 624 (5th Cir. 2008). We will reverse under the clearly erroneous standard "only if we have a definite and firm conviction that a mistake has been committed." *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000). "If the district court made a legal error that affected its factual findings, 'remand is the proper course unless the record permits only one resolution of the factual issue.'" *Ball v. LeBlanc*, 792 F.3d 584, 596 (5th Cir. 2015) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982)).

No. 15-41396

"A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994). To determine whether a breach is material, Texas courts consider the five factors articulated in *Mustang Pipeline Co. v. Driver Pipeline Co.*:

> (a) the extent to which the injured party will be deprived of the benefit he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Henry v. Masson*, 333 S.W.3d 825, 835 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (quoting *Mustang Pipeline*, 134 S.W.3d at 199). What constitutes a breach of contract is a question of law, but whether the breaching conduct occurred is a question of fact. *See X Technologies, Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413–14 (5th Cir. 2013). And whether a breach is material is also a question of fact.[17] *Id.* at 414; *see also Henry*, 333 S.W.3d at 835.

---

[17] While there do appear to be some instances where materiality may be determined as a matter of law, neither Roadster nor TCB argues that the materiality of Roadster's alleged breaches can be decided as a matter of law. *See Mustang Pipeline*, 134 S.W.3d at 199 ("Evidence exists to prove, as a matter of law, that time was a material element of the contract.").

21

No. 15-41396

Here, the district court held that Roadster could not recover on its breach of contract claim because Roadster had materially breached the contract prior to TCB's alleged breaches. The district court recognized that TCB's conduct that allegedly breached the contract centered around its actions on November 15 and 16, 2011 (*i.e.*, the letter declaring events of default and the ex parte application for receivership), and therefore, if Roadster materially breached the contract before those dates, it could not recover on its claim. After considering various alleged breaches committed by Roadster, the district court held that two breaches of the Floor Plan Loan Agreement were material: (1) Roadster materially breached § 9.1(d)[18] by falsely representing in its financial statements and certificates of compliance that it did not incur other loans; and (2) Roadster materially breached § 7.2(o) by not informing TCB that there had been a change in ownership. On appeal, Roadster does not dispute the district court's reasoning that if it committed a prior material breach, then it cannot recover on its claim. Instead, Roadster argues that the district court erred both legally and factually by finding that the breaches were material. We hold that the district court did not clearly err in finding that Roadster committed multiple material breaches.

First, we reject Roadster's argument that the district court legally erred in determining whether the breaches were material. Contrary to Roadster's assertions, the district court correctly stated and applied the law. As part of

---

[18] Section 9.1(d) of the Floor Plan Loan Agreement states that an event of default shall exist if "[a]ny representation or warranty previously, presently or hereafter made by or on behalf of any Obligated Person in connection with any Loan Document is incorrect, false or misleading in any respect when made or deemed to be made." Although the district court's oral ruling only explicitly mentioned § 9.1(d), we find that this conduct would also breach § 7.1(a), which contains a covenant requiring Roadster to "[a]t all times maintain full and accurate books of account and records" and furnish to TCB certain financial statements and certificates of compliance. In any event, Roadster does not argue that this conduct would not constitute a breach of the Floor Plan Loan Agreement. Instead, Roadster's argument is about whether this breach is material.

its oral ruling, the district court clearly explained that, in determining the materiality of a breach, the district court would consider the five factors articulated in *Mustang*. The district court then proceeded to address more than five alleged breaches committed by Roadster, ultimately concluding that two of them were material. To the extent that Roadster's argument is that the district court erred by not explicitly addressing each factor for each of the alleged breaches, we disagree. *Cf. Benoit v. Bordelon*, 596 F. App'x 264, 268 (5th Cir. 2015) (finding that, in considering an excessive force claim, "[t]he magistrate judge's failure to explicitly discuss all five factors does not constitute an erroneous view of the law that warrants de novo review of her factual findings").

Second, a review of the *Mustang* factors supports our conclusion that the district court did not clearly err in determining that Roadster's breaches were material. The district court did not err in finding that the first factor—whether TCB will be deprived of the benefit it reasonably expected—weighed in favor of finding that both breaches were material. Both of the breaches deprived TCB of having an accurate account of Roadster's finances, which was an important part of the bargain and took on heightened importance given that this was a revolving loan. Regarding Roadster's false certificates of compliance, the district court correctly highlighted how the other loans were not for an insignificant amount, but rather were for hundreds of thousands of dollars. Regarding the change in ownership, the district court correctly reasoned that TCB's right to know who the owners were of the privately held company that had borrowed millions of dollars from it was an important part of the parties' bargain.[19] As to the second factor, the district court found that

---

[19] We also reject Roadster's argument that the district court legally erred in applying the first factor. According to Roadster, the district court focused only on whether a technical breach had occurred regardless of whether the provision that was technically breached was

No. 15-41396

it might minimally weigh in favor of Roadster for the breach regarding the false certificates of compliance and was inconclusive for the breach regarding the change in ownership. Whatever minimal weight the district court gave to the second factor does not tip the scales such that the district court's materiality findings were in clear error. Additionally, even assuming arguendo that the third and fourth factors weigh in favor of finding the breaches to be immaterial, the fifth factor does not, considering that Roadster did not reveal to TCB its change in ownership, as it was required to do, and repeatedly provided false certificates of compliance to TCB. Thus, given the weight of the first and fifth factors, we cannot say that the district court clearly erred in finding that these breaches were material.

We also reject Roadster's argument that there was insufficient evidence to support the district court's finding that a change in ownership had occurred. Although it is true that the new owner, Dal Cin, signed an agreement stating that he was "invited to become" a partner of Roadster after certain payments were made, there was sufficient evidence for the district court to find that Dal

---

important to the overall bargain. Roadster argues that it never missed a payment and was over-collateralized, and therefore, this factor weighs in its favor. But taking Roadster's argument to its logical conclusion, no borrower could ever materially breach a loan agreement so long as the borrower had sufficient collateral. In any event, the district court did not reason that any technical breach of the contract meant that the first factor weighed in favor of finding the breach to be material. For example, when considering the false certificates of compliance that did not reveal that Roadster had incurred other loans, the district court considered the amount of the unstated loans and how "that's not a 40,000-dollar loan or something to a party. That is significant." If the district court were only required to determine whether a technical breach occurred, there would have been no need to consider the actual amount of the other loans. Furthermore, even if the district court had legally erred by applying the wrong materiality standard, the only finding that the record permits is that both of Roadster's breaches were material. Both of the breaches deprived TCB of having an accurate account of Roadster's finances, and this was material to the entire loan agreement because TCB was advancing money on a revolving basis and needed an accurate account of the ongoing state of Roadster's finances. Additionally, we also reject Roadster's argument that the district court committed reversible error simply by referring to *Heller Healthcare Finance, Inc. v. Boyes*, No. 300-cv-1335D, 2002 WL 1558340 (N.D. Tex. July 15, 2002).

Cin had in fact become, in at least some form, a part owner of Roadster. Besides that written agreement, there was also evidence that Dal Cin had contributed a significant amount of money and that this money was for the purpose of acquiring equity in Roadster.  Thus, the district court's finding was not clearly erroneous. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 515 (5th Cir. 2016) ("When 'the district court's account of the evidence is plausible in light of the record viewed in its entirety,' this court 'may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"  (quoting *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 431 (5th Cir. 2014))).

Finally, regarding Roadster's provision of false certificates of compliance, we reject Roadster's argument that there was no evidence supporting the materiality finding.  Roadster conceded that it submitted certificates of compliance that failed to disclose that it had incurred other loans, and there was sufficient evidence supporting the district court's finding that accurate certificates of compliance were important to TCB.  Additionally, Roadster argues that the district court erred in finding that TCB did not know that the certificates of compliance were false, and therefore, the district court should have found that TCB waived its right to accurate certificates of compliance. We similarly reject this argument.  At best, Roadster's argument is that the district court found that TCB was aware of the other loans, and therefore, TCB also must have known that the certificates of compliance were false because it could have deduced that the loans were omitted from the certificates of compliance.  Therefore, according to Roadster, TCB waived its right to accurate certificates of compliance.  But critically, Roadster points to no caselaw supporting its argument that, even assuming that TCB had some knowledge that there were other loans, the district court committed reversible error in finding that TCB did not waive its rights with respect to Roadster's furnishing

of false certificates of compliance. Moreover, Roadster fails even to address the non-waiver provision in the Floor Plan Loan Agreement, which stated, in part, that "[n]o waiver of any provision of any Loan Document and no consent to any departure therefrom shall ever be effective unless it is in writing and signed by Lender."[20]  *See, e.g.*, *Thomas v. EMC Mortg. Corp.*, 499 F. App'x 337, 341 (5th Cir. 2012).

In sum, the district court did not err in entering a take-nothing judgment on Roadster's breach of contract claim.

## IV.  TCB'S APPEAL

Finally, we turn to TCB's appeal from the district court's take-nothing judgment on its claims for attorneys' fees.[21]  At the outset, it is important to put into context TCB's claims for attorneys' fees given the complex and lengthy procedural history of this case.  As discussed above, TCB first filed its claims in state court seeking, *inter alia*, recovery on the balances of the outstanding loans and attorneys' fees.  But because of Roadster's later bankruptcy proceedings, TCB has already recovered (or will recover) the full balances of the loans as part of the Confirmed Plan.  Moreover, under the Confirmed Plan, TCB also recovered (1) its pre-petition fees and expenses, and (2) its post-petition fees and expenses that were incurred in connection with the bankruptcy proceedings.  However, the Confirmed Plan specifically carved out

---

[20] As we have previously mentioned, the district court similarly did not address the non-waiver provision when it was making waiver determinations regarding other alleged breaches committed by Roadster.  However, we need not address those determinations given that Roadster's breach of contract claim already fails because of these two material breaches.

[21] In the district court, TCB also requested attorneys' fees under Texas Civil Practice & Remedies Code § 38.001, which states, in part, that "[a] person may recover reasonable attorney's fees . . .if the claim is for . . . an oral or written contract."  The district court denied TCB's claim for attorneys' fees under this statute because the "additional post-petition fees and expenses, which were incurred in connection with TCB's unwarranted actions were not reasonably incurred and should not be awarded."  TCB does not argue on appeal that the district court erred in denying attorneys' fees under this statute.

TCB's claims for post-petition attorneys' fees related to this litigation. To put it more clearly, after Roadster filed for bankruptcy, Roadster and the guarantors also filed multiple counterclaims against TCB (including, for example, the appealed claims from Roadster and Hafezamini that are addressed above). TCB incurred, and continues to incur, attorneys' fees in defending against these counterclaims. Thus, TCB is only seeking to recover the attorneys' fees that it has incurred in defending against the counterclaims, which was confirmed by TCB's counsel during oral argument. In effect, this means that Roadster's and the guarantors' continuous pursuit of their counterclaims (including through this appeal) has resulted in TCB continuing to incur attorneys' fees that it claims are recoverable under the loan agreements (and in turn, resulting in a larger amount of attorneys' fees that TCB seeks to recover in this case).

In short, TCB continues to pursue its claims not because it seeks to recover the balances of the loans, but rather because it claims that, under the Floor Plan Loan Agreement, Roadster and the guarantors must pay the attorneys' fees that TCB has incurred in successfully defending against Roadster's and the guarantors' counterclaims. For example, under § 7.1(h) of the Floor Plan Loan Agreement, Roadster agreed to "pay all reasonable costs and expenses incurred by or on behalf of [TCB] (including attorneys' fees) in connection with . . . (iii) the borrowings hereunder and other action reasonably required in the course of administration hereof . . . [or] (iv) the defense or enforcement of the Loan Documents." Additionally, under § 9.6 of the Floor Plan Loan Agreement, Roadster must indemnify TCB "from and against any and all liabilities, obligations, claims, . . . suits, costs, [and] expenses" that are incurred by TCB "growing out of or resulting from the Loan Documents and the transactions and events at any time associated therewith (including without limitation the enforcement of the Loan Documents and the defense of

Lender's actions and inactions in connection with the" loan evidenced by the Floor Plan Note.[22]

As an initial matter, we must also clarify the district court's holdings and the parties' arguments on appeal because the parties dispute what precisely the district court held. First, the district court found that both § 7.1(h) and § 9.6 of the Floor Plan Loan Agreement allow recovery of TCB's attorneys' fees. On appeal, neither party disputes the district court's interpretation of these loan provisions. In other words, neither party disputes that, without considering TCB's conduct, the Floor Plan Loan Agreement would otherwise require Roadster to pay the attorneys' fees that TCB incurred. Second, notwithstanding its interpretation of § 7.1(h) and § 9.6, the district court held that TCB could not recover its attorneys' fees. However, the parties' interpretations of the district court's ruling on this point differ. Roadster interprets the district court as providing three independent bases for the take-nothing judgment—namely, TCB breached the contract; the attorneys' fees provisions are unenforceable in light of the Texas Supreme Court's decision in *Zachry*; and the district court used its inherent power to sanction TCB. Conversely, TCB believes that the district court only relied on its *Zachry* analysis.

For the reasons discussed below, Roadster and TCB are each partially correct in its interpretation of the district court's ruling. The district court held that TCB could not recover its attorneys' fees for two reasons: (1) the attorneys' fees provisions are unenforceable under these circumstances in light of *Zachry*;

---

[22] TCB also argues that the Floor Plan Note and the Deed of Trust contain additional provisions requiring Roadster to pay its attorneys' fees. Because the district court's ruling was limited to finding that § 7.1(h) and § 9.6 of the Floor Plan Loan Agreement were unenforceable, we limit our discussion to these loan provisions. However, on remand, the district court can also consider how these other provisions affect, if at all, the scope of TCB's recovery.

and alternatively, (2) the district court used its inherent power to sanction TCB by disallowing recovery.

## A. *Erie* **Guess Regarding the Application of** *Zachry*

We first address whether the district court erred in holding that the attorneys' fees provisions here were unenforceable based on its interpretation of the Texas Supreme Court's decision in *Zachry*. We review a district court's determination of state law de novo. *Am. Reliable Ins. Co. v. Navratil*, 445 F.3d 402, 404 (5th Cir. 2006). "To determine issues of state law, we look to the final decisions of that state's highest court." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010). But in the absence of a controlling decision, "we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case."[23] *Id.* (quoting *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009)).

In *Zachry*, a construction company contracted with the property owner to construct a wharf, but the construction company ended up suffering millions of dollars in delay damages during construction because of the owner's deliberate and wrongful interference. 449 S.W.3d at 101–04. When the owner tried to argue that it was immune from liability for delay damages because of a no-damages-for-delay provision in the contract, the Texas Supreme Court held that the provision was unenforceable when it was used in an attempt to shield the owner from liability for deliberate and wrongful interference with the contractor's performance. *Id.* at 101, 114–18. As part of its reasoning, the Texas Supreme Court noted that, "[g]enerally, a contractual provision 'exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.'" *Id.* at 116 (quoting

---

[23] The parties have not pointed to any cases from the Texas courts of appeal applying *Zachry* to contract provisions similar to those presented in this case.

Restatement (Second) of Contracts § 195(1) (1981)).  The Texas Supreme Court concluded that "the same may be said of contract liability" and to hold "otherwise would incentive wrongful conduct and damage contractual relations."  *Id.*

Here, the district court held that *Zachry*'s reasoning applied to the facts of this case such that the loan provisions, which would otherwise allow recovery of TCB's attorneys' fees, are unenforceable.  Specifically, the district court found that, in light of *Zachry*, "a Texas court would hold that [a] broad-sweeping indemnification clause or broad attorneys' fees clause [is] unenforceable when it leads to the injured party having to indemnify the wrongdoer for the injuring party's own deliberate and intentional wrongdoing."  Although the district court recognized that *Zachry* involved a no-damages-for-delay provision, it reasoned that *Zachry* should extend to this case because allowing TCB to recover attorneys' fees when it acted in bad faith would "incentivize wrongful conduct and damage contractual relationships," which was one of the policy justifications supporting the decision in *Zachry*.

We respectfully disagree.  We hold that *Zachry* does not apply to the loan provisions here.  Put another way, we decline to extend the holding in *Zachry* in such a way as to override the loan provisions.  There is a critical distinction between this case and *Zachry*.  In *Zachry*, the unenforceable provision would have allowed the owner to insulate itself from liability for its own deliberate and wrongful interference, and the Texas Supreme Court emphasized the policy justification for not allowing a party to escape liability for deliberate and wrongful actions.  449 S.W.3d at 116–17 ("[T]he purpose of . . . [this] exception is to preclude a party from *insulating himself from liability* for his own deliberate, wrongful conduct." (emphasis added)).  But in this case, TCB is not using the loan provisions to shield itself from liability because it would not otherwise be facing any liability—TCB successfully defeated the

30

counterclaims.  Instead, TCB is only using the loan provisions to recover its attorneys' fees for its successful defense.  Perhaps the legal issue may have been different had Roadster or Hafezamini succeeded on their counterclaims, but we need not reach that issue because, as discussed above, all of the appealed claims against TCB fail.

Thus, *Zachry* does not apply, under these circumstances, to the loan provisions in this case, and TCB can recover its attorneys' fees according to the terms of the loan agreements.[24]  Regarding the guarantors, the parties spent surprisingly little time in their briefs discussing the guaranty agreements and the impact of the district court's *Zachry* analysis on the guarantors and guaranty agreements.  To the extent that the district court held that the guarantors could not be liable because Roadster was not liable in light of *Zachry*, the district court erred because, as discussed above, *Zachry* does not apply.

Relatedly, we reject Roadster's argument that the district court held, as an independent ground, that TCB could not recover attorneys' fees because it breached the loan agreements.  Based on our review of the record, it is unclear whether the district court's bad faith findings regarding TCB's conduct amounted to a finding that TCB breached the loan agreements under the district court's reasoning.[25]  But this is beside the point.  The district court

---

[24] We note that we are not determining the scope of attorneys' fees recoverable under the loan provisions.  For example, we do not address the claim made during oral argument by TCB's counsel that the attorneys' fees do not need to be reasonable.  There was little briefing by the parties about how fees should be calculated.  The scope and amount of the fees are properly determined on remand, and our holding is limited to reversing the district court's ruling that, under *Zachry*, the loan provisions requiring payment of TCB's attorneys' fees are unenforceable.

[25] The oral ruling contained several conflicting statements about whether TCB's conduct amounted to a breach.  For example, after addressing Roadster's breach of contract claim, the district court stated that "assuming [TCB's conduct] was a breach—and I'm going to get into that."  This implies that the district court's later findings were that TCB's conduct amounted to a breach of the loan agreements.  However, the district court never actually

made its bad faith findings in the context of showing how, in its view, TCB's conduct was in bad faith and sufficiently wrongful that the principles of *Zachry* should extend to this case. However, for the reasons that we just discussed, *Zachry* does not extend to cover the provisions allowing recovery of attorneys' fees here because TCB is not attempting to use the attorneys' fees provisions as a shield to liability. Finally, Roadster has not articulated a reason why, as a matter of contract law, TCB should not recover its attorneys' fees for successfully defeating numerous counterclaims because it purportedly did not rightfully exercise its remedies. Roadster cites no caselaw or provisions in the loan agreements for this argument.[26]

## B. The District Court's Inherent Power

As an alternative basis for entering the take-nothing judgment, the district court used its inherent power to sanction TCB, thereby denying TCB

---

stated that TCB's conduct amounted to a breach of the loan agreements. Although the absence of such a clear statement is not necessarily fatal to the interpretation that TCB breached the loan agreements, there are other aspects of the oral ruling further supporting the interpretation that the district court did not find a contractual breach. For example, while discussing whether TCB deemed itself insecure in good faith (which was one of the events of default at issue), the district court noted that "[i]t's difficult to say that a bank is not in good faith when it learns that one of two principals is going to be indicted and has been arrested and that the DEA is in seizing books, records, computers and vehicles. No matter how much the property is worth, the court would not go so far as to say some action is not warranted." This statement could be interpreted as implying that an event of default had occurred, and therefore, TCB could validly exercise its default remedies.

[26] Roadster contends that no event of default occurred, and therefore, TCB breached the loan agreements by declaring default and accelerating the loan. However, it is unclear whether the district court found that no event of default had occurred. Contrary to Roadster's assertions, the fact that the district court found that TCB engaged in bad faith conduct does not conclusively establish that no event of default had occurred. Notably, the district court never made a finding regarding whether there was an event of default under § 9.1(o), which occurs when Roadster or any guarantor "suffers a material adverse change in its business or financial condition." Furthermore, the district court did not explicitly address TCB's arguments regarding other events of default that occurred under the Floor Plan Loan Agreement. While TCB maintains its arguments on appeal that there were other events of default besides those under § 9.1(n) and § 9.1(o), Roadster addresses only § 9.1(n). However, we need not reach these issues because they are not pertinent to our above holding regarding *Zachry*.

any recovery of its attorneys' fees.  A review of the oral ruling supports this conclusion. For example, the district court discussed cases establishing that district courts have the "inherent power to sanction a litigant by dismissing a case," but this power "must be exercised with restraint and discretion."  The district court then noted that it had "spent a lot of time thinking about this," and "when litigation is instigated or conducted in bad faith or there's been willful abuse of the judicial process, that meets those stringent standards."

However, the district court erred because it failed to provide TCB with adequate due process.  Federal courts have the inherent power to assess sanctions under certain circumstances, such as "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or has defiled the 'very temple of justice.'" *See Matta v. May*, 118 F.3d 410, 416 (5th Cir. 1997) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)).  In using its inherent power, a district court "must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Sandifer v. Gusman*, 637 F. App'x 117, 121 (5th Cir. 2015) (per curiam) (quoting *Chambers*, 501 U.S. at 50).  Here, the district court did not provide sufficient due process when it sua sponte used its inherent power during its oral ruling without providing TCB with any meaningful opportunity to respond.

Based on the current record and circumstances, we cannot say as a matter of law that the district court's use of its inherent power is reversible error such that remand is unnecessary. *Cf. Kenyon Int'l Emergency Servs., Inc. v. Malcolm*, 2013 WL 2489928, at *6–7 (5th Cir. May 14, 2013) (reversing sanctions order rather than remanding for a show-cause proceeding).  That being said, we express no view on the ultimate merits of whether sanctions are appropriate, and if so, whether the severe sanction of denying TCB's entire claim for attorneys' fees is appropriate.  Indeed, we question at least some of the district court's reasoning for using its inherent powers, such as how TCB's

claims were "a suit that runs up attorneys' fees to recover attorneys' fees based on the kind of actions the bank took in the first place, especially given that they are in—once the bankruptcy court got ahold of it and confirmed those orders, the bank received everything it was entitled to or everything it agreed it was entitled to." But as we highlighted above, TCB's pursuit of attorneys' fees in this action was necessary because Roadster (and the guarantors) continued to pursue their counterclaims. TCB incurred attorneys' fees because it was required to defend against the counterclaims. And TCB did not necessarily receive everything it was entitled to as part of the Confirmed Plan because the Confirmed Plan specifically carved out TCB's pursuit of its attorneys' fees for defending against the counterclaims.

On remand, if the district court determines that sanctions are still appropriate, the district court should make more definite findings on what supports its use of its inherent power.

## V. CONCLUSION

The district court's take-nothing judgment with respect to Roadster's claim against TCB is AFFIRMED. The district court's grant of TCB's summary judgment motion with respect to Hafezamini is AFFIRMED. The district court's take-nothing judgment with respect to TCB's claims against Roadster and the guarantors is VACATED and the case is REMANDED for further proceedings consistent herewith. Roadster, Hafezamini and TCB shall bear the costs of this appeal.