# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 19, 2022

Lyle W. Cayce
Clerk

No. 20-30364

O'Brien's Response Management, L.L.C.;
National Response Corporation,

*Plaintiffs—Appellees*,

*versus*

BP Exploration & Production, Incorporated;
BP America Production Company,

*Defendants/Third Party Plaintiffs—Appellants*,

*versus*

Navigators Insurance Company,

*Third Party Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-1418

Before Jones, Clement, and Graves, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

This latest installment of litigation spilling out of the Deepwater Horizon offshore explosion and fire centers on who should pay for personal

No. 20-30364

injury claims brought by employees of two companies hired by BP Exploration & Production Inc. and BP America Production Company ("BP") to clean up the oil spill. Specifically, BP claims to be an "additional insured" under two policies obtained by O'Brien's Response Management, L.L.C. ("O'Brien's"). BP also seeks indemnification by O'Brien's and/or National Response Corporation ("NRC," together "Responders") under its contract with each plaintiff.

The issues here require interpretation of BP's contracts with each of the Responders and the related insurance policies in light of sometimes sparse case law. Ultimately, we conclude that BP was an additional insured up to the minimum amount required by its contract with O'Brien's; the two insurance policies maintained by O'Brien's cannot be combined to satisfy the minimum amount; O'Brien's is not required to indemnify BP because BP materially breached its indemnification provision with respect to the Back-End Litigation Option ("BELO") claims brought by O'Brien's employees; and a claim-by-claim analysis is required to determine the materiality of any breach regarding the remaining indemnity claims against both O'Brien's and NRC. Thus, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.[1]

## I. BACKGROUND

BP retained the Responders for nearly $2 billion to assist with clean-up efforts in the aftermath of the April 2010 Deepwater Horizon oil spill. BP and O'Brien's executed a Bridge Agreement in 2010 that incorporated, with modifications, a Master Consulting Services Contract they originally entered

---

[1] We do not reach any potentially applicable exclusions, such as the "oil rig exclusion" mentioned by Navigators in its briefing, that were not ruled on by the district court in the first instance.

into in 2004 (the "BP-O'Brien's Contract"). BP also entered into an Agreement for the Provision of Response Resources with NRC in 2003 (the BP-NRC Agreement). The relevant provisions are described below.

The Responders and their respective subcontractors employed thousands of workers as part of their clean-up efforts. Thousands among these workers then filed personal injury lawsuits against BP, which were consolidated with the multidistrict litigation ("MDL") arising from the disaster.[2] The district court organized the MDL cases into various "pleading bundles." Relevant here, the B3 bundle included "all claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010." On the court's instruction, the Plaintiffs' Steering Committee ("PSC") filed a B3 Master Complaint in December 2010 that plaintiffs could join by filing a short form joinder. In April 2012, BP settled the B3 claims ("Medical Settlement") with the PSC and a defined settlement class. The opt-out deadline closed in October 2012. Importantly, the Medical Settlement created a new type of claim for latent injuries—the BELO claims—so long as settlement class members followed certain procedures. BP calls these claims "creature[s] of the Medical Settlement." Although BP emphasizes that the Responders were aware of the settlement before the district court approved it in January 2013, BP does not dispute that neither O'Brien's nor NRC had control over the negotiations, nor did either approve the settlement.[3]

---

[2] After the district court granted the Responders' motion to lift the MDL stay in 2019, it deconsolidated the case "for organizational purposes[.]"

[3] In its brief, BP points to a letter from the Responders to the district court that demonstrates the Responders were aware of the settlement and that they were not involved in its negotiation. It states the latter conclusion directly: "The Clean-Up Responder Defendants are not involved in the ongoing settlement negotiations."

No. 20-30364

After the settlement, plaintiffs could bring two relevant types of claims: (1) opt-out B3 claims if they did not participate in the settlement, and (2) BELO claims if they were class members who alleged latent injuries and followed the approved process per the Medical Settlement.[4]

In March 2017, BP notified O'Brien's about a BELO suit filed by an O'Brien's employee and sought indemnification under their Contract for the first time. BP subsequently sought indemnification for approximately 1,800 BELO claims by O'Brien's employees and 200 such claims by NRC employees, as well as a smaller number of opt-out B3 claims against each Responder. The Responders refused to indemnify BP under their respective contracts. Instead, they sued for a declaration that they need not indemnify BP for any BELO or opt-out B3 claims. BP counterclaimed for breach of contract, a declaration in favor of its indemnification rights, and unjust enrichment.

O'Brien's is a named insured on two pertinent policies: (1) a Primary Bumbershoot Liability policy issued by Navigators Insurance Company (the "Primary Bumbershoot" policy)[5] providing marine umbrella insurance with an aggregate limit of $10,000,000; and (2) an Excess Bumbershoot Liability policy (the "First Excess Bumbershoot" policy) issued by Navigators and other insurers, which incorporates the Primary Bumbershoot's policy terms and provides excess coverage up to $90,000,000.

---

[4] To count as a BELO claim the condition must have been *diagnosed* after April 16, 2012. Thus, a condition that manifested before the settlement and was later diagnosed might still qualify as a BELO claim.

[5] "A 'bumbershoot,' the English term for umbrella, is a marine insurance policy covering multiple liability coverages in excess of one or more different underlying policies, comparable to the commercial liability umbrella covering liabilities on land." 15 COUCH ON INSURANCE § 220:32 & n.29 (2021) (citation omitted).

4

No. 20-30364

O'Brien's also maintained marine general liability coverage under a policy issued by Starr Indemnity & Liability Company ("Starr policy") and a contractor's operations and professional services environmental insurance ("COPS") policy that covered liabilities excluded by the Starr policy. Both policies had coverage limits of $1 million per occurrence and $2 million in aggregate and have been exhausted.

In June 2019, O'Brien's notified BP that it was an additional insured under the Primary and First Excess Bumbershoot policies. Navigators, however, refused BP's demands for coverage, prompting BP to amend its counterclaim against the Responders and file a third-party claim against Navigators on its bumbershoot policies.

Navigators, BP, and O'Brien's and NRC filed cross-motions for judgment on the pleadings. The district court ruled against BP on each issue, concluding that (1) BP was not an additional insured under the relevant insurance policies; (2) O'Brien's was not required to indemnify BP because BP violated the consent-to-settle, notice, and control-of-defense provisions of the BP-O'Brien's Contract; and (3) NRC was not required to indemnify BP under their contract because NRC "had no liability under 'Responder Immunity Law.'" The district court also determined that O'Brien's did not breach its contractual obligation to acquire insurance coverage for BP. BP timely appealed.

## II. DISCUSSION

This court reviews Rule 12(c) judgments on the pleadings *de novo*. *See Garza v. Escobar*, 972 F.3d 721, 727 (5th Cir. 2020) (citations omitted). We accept well-pleaded facts as true and construe them in the light most favorable to the non-moving party. *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th

5

Cir. 2017) (citation omitted).  The parties agree that Texas law applies.[6]  As already stated, this appeal turns on whether BP is an additional insured under the Primary and First Excess Bumbershoot policies and on the interpretation of the indemnification provisions of BP's separate contracts with O'Brien's and NRC.  We address the issues in turn.

## A.  Additional Insured Status

BP seeks coverage as an "additional insured" under the Primary and Excess Bumbershoot policies covering O'Brien's.    Under Texas law, "[i]nsurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally." *Richards v. State Farm Lloyd's,* 597 S.W.3d 492, 497 (Tex. 2020) (internal quotation marks and citation omitted).  Further, to construe contracts, Texas courts "give terms their plain, ordinary and generally accepted meaning . . . . [and] will enforce the unambiguous document as written."  *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex. 1996) (citations omitted).  Although insurance coverage analysis "necessarily begins with the four corners of the policies[,] . . . ." the Texas Supreme Court holds that "insurance policies can incorporate limitations on coverages encompassed in extrinsic documents by reference to those documents." *In re Deepwater Horizon,* 470 S.W.3d 452, 460 (Tex. 2015) (citations omitted).  If a policy "directs [Texas courts] elsewhere, [they] will refer to an incorporated document to the extent required by the policy[,]" but they "do not consider coverage limitations in underlying transactional documents[]" unless required by the policy. *Id.*

---

[6] Navigators reserved the right to contest the Texas choice-of-law provision, contending the BP-O'Brien's Contract was amended post-loss, but decided to accept Texas law here because it did not identify any conflict-of-law issues.

No. 20-30364

In a provision similar to one involved in *Deepwater Horizon*, the Primary Bumbershoot policy defined an "assured" to include "any person, organization, trustee or estate to whom the Named Assured is obligated by virtue of a written contract or agreement to provide insurance as is afforded by this policy[.]" *Compare In re Deepwater Horizon,* 470 S.W.3d at 457. And the First Excess Bumbershoot policy was subject to the primary policy's terms, definitions, exclusions, and conditions. BP is thus an additional insured under the two bumbershoot policies to the extent required by the BP-O'Brien's Contract.

The BP-O'Brien's Contract confirms BP's status with regard to at least some of O'Brien's insurance coverage. Section 12.01, entitled "Insurance," required O'Brien's to maintain four types of policies,[7] including:

> 12.01.03     Comprehensive General Liability Insurance, including contractual liability coverage, with minimum limits of US$2,000,000 per occurrence.

Section 12.02 established BP's additional insured status as to the CGL coverage and marine extension thereof:

> Except for Workers' Compensation Insurance set forth in Section 12.01.01, all policies shall name [BP entities] as additional insureds. In addition, all of the policies listed above, without exception, shall be endorsed to waive subrogation against the [BP entities] . . . . Additionally, if [O'Brien's] shall perform any Services hereunder on navigable waters then each of the policies listed in 12.01.02 [Employer's Liability] and 12.01.03 [Comprehensive General Liability] above shall be endorsed to cover marine operations.

---

[7] Workers' compensation, employer's liability, and automobile liability insurance are the additional required coverages.

No. 20-30364

Navigators challenges BP's claim to be an additional insured on the bumbershoot policies for two primary reasons.    First, Navigators distinguishes its bumbershoot policies from the CGL coverage referenced in Section 12.01.03 and argues that O'Brien's fulfilled its contractual obligations by naming BP as an additional assured on its Starr and COPS policies that provided GCL-type coverage.  Second, once O'Brien's fulfilled its obligations with respect to CGL coverage, Navigators insists that its bumbershoot policies did not provide additional assured coverage to BP. Alternatively, Navigators argues that if BP is entitled to additional assured coverage under its bumbershoot policies, then that coverage is limited to the $2,000,000 minimum required by Section 12.01.03.  Navigators' first two arguments do not withstand analysis, but the coverage amount argument must be closely examined.

### 1. CGL Coverage

To begin, Navigators concedes that the Starr policy provides "standard primary CGL [i]nsurance, modified slightly to cover marine operations."  It also agrees that BP is an additional assured under the Starr and COPS policies, and that its Primary Bumbershoot policy provides excess coverage that "expressly includes the Starr Policy and the COPS policy by name."  Finally, Navigators describes the First Excess Bumbershoot policy as "follow-form" of its primary policy.  To state these facts is to conclude that the bumbershoot policies afford CGL-type coverage as described in the BP-O'Brien's Contract.

Navigators resists the obvious, emphasizing general differences between CGL and bumbershoot policies writ large.  General distinctions are unpersuasive here.  Undoubtedly, bumbershoot policies can differ from standard CGL policies.  *See* Robert T. Lemon II, *Allocation of Marine Risks: An Overview of the Marine Insurance Package*, 81 TUL. L. REV. 1467, 1492

No. 20-30364

(2007) (citation omitted) (recognizing that a "CGL policy is not a marine policy and is not intended to cover risks[]"). But the specific coverage overlap of Navigators' bumbershoot policies with the Starr policy (which was modified to cover marine operations, after all), together with the bumbershoot policies' direct reference to the Starr and COPS policies, refutes any meaningful distinction here. Therefore, the specific coverage provided by the policies is the relevant inquiry.[8] The bumbershoot policies provide CGL-type coverage, so they are best understood as CGL policies under the BP-O'Brien's Contract, and BP is an additional assured.

Navigators also asserts that the BP-O'Brien's Contract limits BP's assured status to "*primary* CGL insurance, not bumbershoot, umbrella or excess insurance." But the word "primary" is nowhere in the text of the Contract, which requires only that O'Brien's "maintain" CGL insurance with a certain minimum limit.[9]

---

[8] At one point in this litigation, O'Brien's and BP considered the term CGL as used in the agreement to encompass the Primary Bumbershoot policy. In opposing motions for judgment on the pleadings, the Responders stated that "BP was automatically named as an additional insured on the [Primary Bumbershoot policy], which provides CGL insurance." And in their answer to BP's amended counterclaims, the Responders recognized that "[i]n June 2019, O'Brien's notified BP that BP is an additional insured under the [Primary Bumbershoot policy] . . . ." Although the Responders now take "no position" on the insurance issue "because it does not concern them," their prior clear understanding of the Primary Bumbershoot policy supports our conclusion that Navigators' policies provide CGL-type coverage. *See Harris v Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) (recognizing that "[c]ourts rightfully assume that parties to a contract are in the best position to know what was intended by the language employed[,]" and "should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary" (citations omitted)).

[9] To be sure, some contracts include separate provisions requiring CGL insurance and also excess coverage. *See, e.g.*, *Ironshore Specialty Ins. Co. v. Aspen Underwriting, Ltd.*, 788 F.3d 456, 458 (5th Cir. 2015) (requiring CGL insurance and excess liability insurance above the CGL policy in distinct subsections). None of the cases cited by Navigators,

No. 20-30364

### 2. Contractual Minimum Coverage

The next question is how much coverage BP is entitled to as an additional assured on the bumbershoot policies. BP contends it is entitled to the full $100,000,000 under these policies notwithstanding that Section 12.01.03 required O'Brien's to purchase CGL with "minimum limits" of $2 million per occurrence.

*In re Deepwater Horizon* provides the analytical framework, and previous decisions of this court supply a key to the outcome. The *In re Deepwater Horizon* court looked first at the insurance policy, whose language, substantially similar to that before us, defined an additional insured as any entity to whom the named insured was "obliged by oral or written Insured Contract . . . to provide insurance such as afforded by [the] Policy." 470 S.W.3d at 457 (internal quotations omitted and alterations in original). The court then inspected the parties' contract to determine the extent of coverage.

Because the Primary Bumbershoot policy creates an "obligation" that mirrors the obligation in *In re Deepwater Horizon,* we move to the terms of the BP-O'Brien's Contract referenced by the Primary Bumbershoot policy. BP focuses on language in Section 12.02, which states that "[e]xcept for Workers' Compensation Insurance set forth in Section 12.01.01, all policies shall name [the BP entities] as additional insureds." "All policies," it contends, means *all* policies procured by O'Brien's. But the very next sentence in Section 12.02 references "all of the policies listed above" when dealing with waiver of subrogation. And the logical inference from both sentences together is that in excluding Workers' Compensation Insurance,

---

however, concludes that excess coverage mirroring a primary CGL policy does not constitute CGL coverage. And we see no need to draw that conclusion today.

No. 20-30364

Section 12.02 cross-references "all" of the policies in Section 12.01.01 and nothing more. BP itself concedes that "all policies" does not literally mean "all," because in context, the phrase "plainly refers to all insurance policies providing the types of 'insurance coverage' listed in the previous section, except for Workers' Compensation Insurance." BP fails to explain how the CGL's minimum coverage limits are not included in the "all policies" language of Section 12.02.

The BP-O'Brien's Contract contraindicates extending BP's additional assured status to the maximum coverage voluntarily purchased by O'Brien's. Our precedent strongly reinforces that conclusion. In the wake of *In re Deepwater Horizon*, this court made an *Erie* guess in *Ironshore Specialty Ins. Co. v. Aspen Underwriting, Ltd.* that an additional assured was covered only to the minimum *obliged* by the parties' contract and not the maximum obtained by the named insured.[10] 788 F.3d 456, 461-63 (5th Cir. 2015). To be sure, the BP-O'Brien's Contract specifies CGL coverage with $2 million "minimum limits," whereas the policy in *Ironshore* referenced only "$5 million." *Id.* at 458. But that is still a limit, and the parties agreed in *Ironshore* that $5 million was the maximum required by the master service agreement there. *Id.* at 459.[11]

---

[10] The policy in *Ironshore* covered "any person or entity to whom [the insured was] obliged by a written 'Insured Contract . . . .'" 788 F.3d at 458. The court reasoned that because a similar provision was sufficient "in *Deepwater Horizon* to incorporate the Drilling Contract's limitation on coverage[,] . . . . [t]he nearly identical language in [the contractor's] policies . . . compel[led] the same result." *Id.* at 463.

[11] The parties also dispute the commercial context of the BP-O'Brien's Contract. But their arguments amount to a draw. BP claims the "all policies" clause was intended to "hitch[]" BP's wagon to O'Brien's full coverage because O'Brien's managed the cleanup work and "had every incentive to obtain adequate CGL insurance for itself." But Navigators points out that BP did not take this approach with its NRC contract, and argues that it was equally reasonable for BP to require certain minimum coverage from O'Brien's. In short, the commercial context is not decisive here. *Cf. Kachina Pipeline Co., Inc. v. Lillis*,

This court's decision in *Musgrove v. Southland Corp.* also rejects BP's proffered interpretation.[12]  898 F.2d 1041 (5th Cir. 1990).  A key issue in *Musgrove* was whether a party was an additional insured on an excess policy covering losses greater than $1,000,000.  *Id.* at 1043-44.  Like the bumbershoot policies here, an excess policy in *Musgrove* limited coverage for additional insureds to those whom the named insured was "obligated by virtue of a written contract."  *Id.* at 1043.  The relevant contract required primary CGL insurance "of not less than $1 million per occurrence."  *Id.* The court rejected drop-down coverage by the excess policy, however, because of its express limitation to losses exceeding $1 million.  It also disregarded an additional assured provision that would have required "[a]ll insurance coverages carried by Contractor, *whether or not required hereby*, . . ." to also "extend to and protect Company . . . to the full amount of such coverage, but not less than" $1,000,000 in CGL insurance.  *Id.* (emphasis and alterations in original).  The panel rejected application of this language, *inter alia,*[13] because the insured "was not contractually obligated to

---

471 S.W.3d 445, 450 (Tex. 2015) (permitting consideration of "facts and circumstances surrounding a contract, . . ." but recognizing that "extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity." (citations omitted)).

[12] Although *Musgrove* arose under Louisiana law, a panel of this court favorably cited the decision while applying Texas law.  *See Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1045 (5th Cir. 1991) (citing *Musgrove v. Southland Corp.*, 898 F.2d 1041, 1043 (5th Cir. 1990)).  *Forest Oil* construed one policy to the "full extent of its . . . coverage[]" because it lacked language that would provide coverage "only to the extent that [the insured] was contractually required to provide such insurance[,]" but construed another policy, which did express such language, as limited to the amount required by an underlying contract.  *Id.* at 1044-45.

[13] Principally, this language appeared in a contractor's manual attached to the contract, and the manual stated that the parties' contract "prevails in any conflict." *Musgrove,* 898 F.2d at 1043-44.  Alternatively, the panel held, the manual's language gave the insured the prerogative, but not a duty, to purchase excess insurance on the other party's behalf.  *Id.* at 1044.

obtain excess liability coverage for [the other party.]" *Id.* at 1044 (citation omitted).

As in this case, the insurance policy in *Musgrove* only covered additional insureds as "obligated" by an insured's written contract. *Id.* at 1043. Further, the contract required CGL coverage "of not less than" a certain amount. *Id.* And this court enforced the policy as a limit on excess coverage notwithstanding additional insured language that, if applicable, would have required the company to be named "on all of the above insurance[.]" *Id.* at 1043-44.[14]

BP relies heavily on a Georgia state court's interpretation of a similar additional insured clause, which it describes as the only authority that construed the "all policies" language at issue in this appeal. *See Ins. Co. of Pa. v. APAC-Se., Inc.*, 677 S.E.2d 734 (Ga. Ct. App. 2009). *APAC* is unpersuasive for several reasons. First, as we have explained, this court favors requiring insurance companies to cover only the minimum amount obliged by an underlying referenced contract when the policy contains similar language to the bumbershoot policies at issue here. That legal context influences our interpretation. *Cf.* 8 COUCH ON INSURANCE § 112:31 (2021) (recognizing that "[t]he phrase 'additional insured' is affected by

---

[14] We recognize that, under Texas law, when two reasonable interpretations of an insurance policy exist the one favoring coverage should be preferred. *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 380 (Tex. 2012) (citation omitted). This rule applies even where a policy incorporates another agreement by reference. *Aubris Res. LP v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 483, 489 n.3 (5th Cir. 2009) (seeing "no reason why the special rules of insurance policy interpretation should not apply where, as here, the insurance policy's additional insured endorsement incorporates section 10.2 by reference[]"). Nevertheless, in light of *Ironshore*, *Forest Oil*, and *Musgrove*, and the BP-O'Brien's Contract itself, we find just one reasonable interpretation. *See In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015) ("Disagreement about a policy's meaning does not create an ambiguity if there is only one reasonable interpretation.").

many sources:    (1) definitions contained in the policy, (2) statutory definitions, and (3) case law that has applied the phrase to various fact patterns[]").

Second, the additional insured clause in *APAC* distinguished between "all policies" and "required insurance," and the court characterized the latter term as "setting forth other duties placed upon [the named insured] relating to insurance procurement." 677 S.E.2d at 739. No such distinction exists in the additional insured clause here. BP nonetheless emphasizes the phrase "required insurance coverage" in Section 11.07 of the BP-O'Brien's Contract, a separate provision requiring insurance coverage of the parties' mutual indemnity duties. BP would compare that language with the "all policies" language in Section 12.02. The comparison does not work; in *APAC*, the court's interpretation relied on the fact that "all policies" and "required insurance" were "two different terms in short sequence within the same paragraph."[15] *Id.*

Finally, the *APAC* court held a narrow interpretation of "all policies" unlikely because it "would undermine [the named insured's] ability to ensure that it meets its contractual obligation . . . ." to provide indemnification. *Id.* But, as just noted, that same concern is not present in the BP-O'Brien's Contract, which separately requires coverage for the parties' indemnity obligations and states that indemnity and insurance provisions are independent of each other.

---

[15] Additionally, Articles 11 and 12 are completely different from the *APAC* provision. Section 11.07 used "required insurance coverage" to emphasize that the parties' Article 11 "indemnity obligations" are "independent of" the Article 12 "insurance requirements." Thus, the "all policies" language in Section 12.02 was intended to ensure BP was named an additional insured on the policies procured by O'Brien's *to satisfy its coverage obligations* set forth in Section 12.01.03.

We conclude that the BP-O'Brien's Contract, read in full, adopts the $2 million minimum CGL coverage as the maximum required to be furnished by each party for the benefit of the other and that Navigators' bumbershoot policies incorporated the limit of the contractual obligation.

### 3. The Starr and COPS Policies Do Not Satisfy the Minimum

Although the district court correctly concluded that BP was only an additional insured with respect to the $2,000,000 obligated by the BP-O'Brien's Contract, it erred in concluding that amount was fully satisfied by the Starr and COPS policies (each bearing $1,000,000 coverage limits per occurrence).[16] BP is entitled to $2 million of coverage.

The facts speak for themselves. The Starr policy provides CGL-type coverage but excludes pollution and professional liability coverage. The COPS policy fills that gap by covering pollution and professional liability. The two policies cover different sets of risks and each affords a single $1,000,000 layer of complementary CGL-type coverage per occurrence. Allowing Navigators, as it urges, to count the policies together would create an absurd result. A party could obtain primary CGL coverage, subject it to numerous exclusions, obtain separate policies covering only those exclusions, add the total together, and thus circumvent contractual minimum amount requirements.[17] We conclude, instead, that the Starr and COPS policies cannot be combined to meet the minimum CGL coverage

---

[16] According to Navigators, the fact that the Starr and COPS policies are exhausted has no bearing on whether they count toward the minimum CGL coverage required by the BP-O'Brien's Contract. BP does not dispute this point and thus concedes it.

[17] The parties also dispute whether the COPS policy's claims-made coverage for professional liability conflicts with the BP-O'Brien's Contract's requirement that minimum coverage limits be "per occurrence." While this may provide another reason not to consider the COPS policy a separate CGL policy for purposes of complying with the minimum $2,000,000 coverage requirement, we need not reach it.

requirement.  Together, they only constitute $1,000,000 of the $2,000,000 required by the BP-O'Brien's Contract because they are mutually reinforcing policies designed to satisfy the same obligation by filling in each other's gaps.

## B.  Indemnification Obligations

Notwithstanding the contractual mutual indemnity obligations between the Responders and BP, the district court concluded that BP was not entitled to indemnification under either contract for any of the claims. Regarding O'Brien's, the district court concluded BP violated the BP-O'Brien's Contract's notice, consent-to-settle, and control-of-defense prerequisites to indemnification.  With respect to NRC, it concluded that no indemnification obligations arose under the contract with respect to any claims because NRC was immune pursuant to applicable federal responder immunity laws.  We discuss each contract in turn.

### 1.  BP-O'Brien's Contract BELO claims

Article 11 of the BP-O'Brien's Contract holds each party to mutual indemnity obligations with regard to injuries to persons within their control. Section 11.02 states that this duty is  "[s]ubject to the other provisions of this Article 11[.]"  Section 11.04 then articulates notice, control-of-defense, and consent-to-settle requirements for indemnification:

> Contractor or Company as the case may be shall *promptly give to the other party notice in writing of any claim made or proceedings commenced* for which Contractor or Company claims to be entitled to indemnification under this contract.  Such notice shall state with as much detail as is reasonably practicable the facts and circumstances giving rise to the claim and shall be given as soon as possible after the party seeking indemnity hereunder . . . becomes aware of such claim or proceeding. The  [indemnitor] . . . shall  confer  with  the  indemnitee concerning the defense of any such claim or proceedings but, subject to the remainder of this Section 11.04, *the indemnitor or*

No. 20-30364

> *its insurer shall retain control of the conduct of such defense*, including, but not limited to, the selection and management of counsel. *Notwithstanding the foregoing, however, neither party shall effect settlement or compromise of any claim or proceeding without having obtained the prior written consent of the other party*, which shall not be unreasonably withheld . . . . The indemnitee may, upon written notice to the indemnitor and at the indemnitee's sole cost and expense, select its own counsel to participate in and be present for the defense of any such claim or proceeding, *provided such counsel shall not take any action in the course of such claim or proceeding to prejudice the defense of such claim or proceeding.*

(emphasis added).

The district court correctly concluded that BP materially breached the BP-O'Brien's Contract regarding the BELO claims.[18] Those are the claims that BP agreed with the PSC to litigate, if plaintiffs followed certain procedures for claims that arose following the Medical Settlement. Invoking a prior material breach to justify non-performance is an affirmative defense on which O'Brien's bears the burden of proof. *See Tony Gullo Motors I, L.P.*

---

[18] Contrary to O'Brien's' position, the "subject to" preface to Section 11.02 is not best read as turning the subsequent notice, consent-to-settle, and control-of-defense provisions regarding indemnity into conditions precedent, whose non-fulfillment would void the indemnity obligation. In *Cedyco Corp. v. PetroQuest Energy, LLC*, this court observed that "Texas does not generally favor reading conditions precedent into contracts, . . . ." before finding such a condition although in a much different context. 497 F.3d 485, 488–89 (5th Cir. 2007) (citation omitted). The general rule holds that "language in a contract is not construed to create a condition precedent if another reading of that language is possible." *Marathon E.G. Holding, Ltd. v. CMS Enters. Co.,* 597 F.3d 311, 321-22 (5th Cir. 2010) (citations omitted); *see also Foreca v. GRD Development Co.,* 758 S.W.2d 744, 745–46 (Tex. 1988) (concluding that "'subject to legal documentation' language is not conclusive on intent to contract[]" in rejecting the argument that such a phrase "constitutes an uncomplied with condition precedent[]" (citation omitted)). The remainder of the indemnity obligation is sufficiently open-ended to preclude a condition precedent.

17

No. 20-30364

*v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). "A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Grp. Lloyds,* 875 S.W.2d 691, 692 (Tex. 1994) (citations omitted). "By contrast, when a party commits a nonmaterial breach, the other party is not excused from future performance but may sue for the damages caused by the breach." *Bartush–Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam) (internal quotation marks and citation omitted).

Texas courts consider the following five factors when determining whether a breach is material:

> 1) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> 2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> 3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> 4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; and
> 5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241

(1981)); *see In re Dall. Roadster, Ltd.*, 846 F.3d 112, 127–29 (5th Cir. 2017) (recognizing and applying the Restatement factors).[19]

By entering the Medical Settlement without O'Brien's consent, BP breached the control-of-defense and consent-to-settle provisions of the indemnity clause. The consent-to-settle provision states that "neither party shall effect settlement or compromise of any claim or proceeding" without obtaining written consent of the other party. BP failed to include O'Brien's in the negotiation over BELO claims, and it preemptively agreed to deprive the defense of such later-accruing claims of certain defenses while also extending the limitations period to four years.[20]

BP attempts to avoid any finding of breach by emphasizing that it was only obliged to notify O'Brien's, according to their Contract, once there were actual "claim[s] made" or "proceedings commenced." Conversely, it was not required to obtain O'Brien's consent for the Medical Settlement because the BELO claims arose afterwards (and the settlement only resolved B3 claims for which BP does not seek indemnification).

Though chronologically accurate, these arguments are unconvincing. The consent-to-settle provision states that "*[n]otwithstanding the foregoing*, however, neither party shall effect settlement *or compromise* of *any* claim or proceeding . . .*" without obtaining written consent of the other party. The lexical range of the word compromise includes "a concession to something

---

[19] The *Mustang Pipeline* court also noted the Restatement's two additional "circumstances [having to do with delayed performance] that are significant in determining when a party's duties are discharged under a contract due to the other party's material breach[,]" but neither is relevant here. *Mustang Pipeline Co., Inc., Inc.*, 134 S.W.3d at 199.

[20] Other "compromising" aspects of the Medical Settlement included no cap on compensatory damages, disallowing defenses like claim splitting and laches, and not requiring proof of elements like exposure to contaminants.

derogatory or prejudicial." *Compromise*, MERRIAM WEBSTER DICTIONARY, https://merriam-webster.com/dictionary/compromise (last visited Nov. 17, 2021). Nothing in this provision excludes compromising *future* claims, as the Medical Settlement did in significant part. Further, "notwithstanding the foregoing" disclaims reference to prior language in the same provision that might support limiting O'Brien's right to consent to settle only then-existing claims or proceedings. Finally, the term "any" is one of enlargement and not limitation. The Medical Settlement unambiguously compromised the defense of BELO claims in some respects; BP therefore breached the consent-to-settle provision with respect to the BELO claims.[21]

Finally, the breach was material according to the *Mustang Pipeline* factors.[22] Again, the Medical Settlement undisputedly compromised the defense of BELO claims though it also benefited O'Brien's (e.g., by including it as a released party). BP nonetheless argues that O'Brien's is not prejudiced for *all* BELO claims. For example, a claim brought within the standard

---

[21] We also conclude that BP breached the notice requirement. Although BP was required to give notice for "any claim made or proceedings commenced," the fact that BELO claims were not in existence at the time of the settlement did not obviate BP's obligations in this unique circumstance. As BP concedes, BELO claims are "creature[s] of the Medical Settlement." Any awkwardness about how notice regarding "future" claims works as a practical matter (and as a matter of contractual interpretation) rests squarely on the ingenuity of the settlement terms. At bottom, BP's argument attempts to evade the commonsense purpose of the notice and control-of-defense clauses: to enable the party footing the bill to know of, control, and resolve relevant claims *before* they are settled or otherwise compromised. BP should have notified O'Brien's that it would seek indemnification for newly created BELO claims during the negotiation that settled the initial B3 claims and that spawned the BELO claims.

[22] O'Brien's was entirely deprived of its ability to control the settlement under the first *Mustang Pipeline* factor; it would be difficult for BP to compensate O'Brien's under the second factor given the unknowability of the "but for" world; and BP cannot cure its failure under the fourth factor.

statute of limitations would not benefit from the settlement's extended limitations period, and a claim that does not benefit from claim-splitting would not be prejudiced by the settlement's waiver of that issue. True enough, but O'Brien's is still prejudiced because it did not negotiate and structure the settlement itself, as was its right under the consent-to-settle provision. BP went it alone and created a new class of claims—*all* BELO claims—that were a "creature of" its global settlement. Requiring O'Brien's to independently litigate whether the defense of a given BELO claim was prejudiced by the terms of the Medical Settlement would require inquiry into the "but for" world of whatever settlement O'Brien's might have reached if given the chance.[23] BP's strategy defeated the underlying purpose of the indemnity provisions: to ensure the indemnitor knew about a claim, led the defense, and agreed to all settlements or any compromise of the claims. Because BP's breach was material, O'Brien's is not required to indemnify the BELO claims.

### 2. BP-O'Brien's Contract Opt-Out B3 Claims

We disagree, however, with the district court's conclusion that BP materially breached the notice and control-of-defense provisions of the BP-O'Brien's indemnity agreement for opt-out B3 claims at this stage. Opt-out B3 claims are those that were not settled by the Medical Settlement and therefore remained for individual plaintiffs to litigate against BP. The district court's reasoning rested almost entirely on the length of time—over six years—between the opt-out deadline and the tendering of claims to O'Brien's. Contrary to the court's reasoning, it is far from clear that BP

---

[23] *See Berkley Reg'l Ins. v. Phila. Indem. Ins.*, 690 F.3d 342, 351 (5th Cir. 2012) (finding prejudice in a late-notice case in the insurance context even though "we cannot fully know what effect, if any, [a party's] participation would have had on [the mediation] process").

breached the notice provision for all of the opt-out B3 claims, and even less obvious that any such breach was material.

Although BP had a list of 1,638 valid opt-outs by the deadline prescribed by the Medical Settlement, it needed employer information to tender the claims to O'Brien's. The district court provided minimal support for concluding that this "information was almost certainly available to BP for all of these workers." [24] Although the short form joinders that plaintiffs could file to join the B3 Master Complaint required employer information, the district court recognized "there [was] no guarantee that all cleanup workers would have filed a short form joinder or filled out the employer information." No party seems to dispute that at least *some* of the plaintiffs either omitted or erroneously provided their employer information on the short form joinder. Yet, such information was essential to connecting the claimants with BP's contractors for purposes like investigation and assessing indemnity duties. Resolving the question of BP's breach requires separate inquiry as to what information BP possessed about each claim, what notice was reasonable under the circumstances, and whether BP could have provided notice to O'Brien's for that claim. [25]

Accordingly, we cannot conclude that opt-out B3 claims were materially compromised by the purported delay in notice. O'Brien's

---

[24] The district court generally referenced databases that BP could have utilized. BP disputes this point, and O'Brien's does not engage on this factual issue in its briefing.

[25] To be clear, BP's *post hoc* argument that the claims were "in no shape to be litigated[]" has no mooring in the text of the BP-O'Brien's Contract. Its obligation under the Contract was only to "promptly give to the other party notice in writing of any claim made or proceedings commenced for which [BP] claim[ed] to be entitled to indemnification . . . ." And the notice was required to "state with as much detail as [was] reasonably practicable the facts and circumstances giving rise to the claim and [had to] be given as soon as possible after [BP] bec[ame] aware of such claim or proceeding." This did not create a right for BP to organize the litigation before giving notice.

concedes that "these claims and proceedings were initially stayed against BP and then further sorted out by [Pretrial Order] 63 and 66 . . . ." And, as the district court recognized, this multi-faceted litigation has implicated numerous claims, including B3 claims that "were asserted directly against the Responders." Whether O'Brien's was prejudiced, pursuant to Texas law, with respect to a given claim due to delayed notice is a fact-bound question. *See Bartush-Schnitzius*, 518 S.W.3d at 436 (recognizing that, "[g]enerally, materiality is an issue to be determined by the trier of facts[]" (internal quotation marks and citation omitted)). Developing the factual record is a task for the district court in the first instance.

### 3. Claims Relating to the BP-NRC Agreement

In relevant part, the NRC-BP Agreement requires NRC to indemnify BP only to the extent a claim is "caused by the gross negligence or willful misconduct of [NRC]," and for which NRC was not entitled to the protection of "Responder Immunity Law."[26] This Agreement lacks notice, control-of-defense, or consent-to-settle provisions.

Under the circumstances presented here, the opt-out B3 and BELO claims implicating the BP-NRC Agreement must be evaluated on a claim-by-claim basis. We agree with BP that the district court erred by relying on its 2016 orders to conclude that "under no circumstances is BP entitled to indemnity from NRC." The fact that one set of B3 plaintiffs failed to raise a genuine issue regarding whether NRC had disobeyed federal instructions does not mean no plaintiff ever will.[27] NRC appears to recognize as much,

---

[26] BP and NRC seem to agree that the immunity question turns on the extent to which NRC was acting "pursuant to the authorization and direction of the federal government."

[27] The 2016 orders referenced by the district court focused only on certain B3 claims directed against the clean-up defendants (including the Responders here), *not* those

arguing in large part that "BP has yet to identify any actual case" that would fall within the contract's indemnification provisions. NRC acknowledges that if such a case ever materialized "the most that would follow from BP's argument is that it remains able to argue for a different result under those peculiar facts[.]" We agree—BP should be able to make such an argument under appropriate facts. Thus, we conclude that whether a given claim falls within the BP-NRC Agreement's indemnification provision is a claim-specific, factual inquiry best resolved by the district court in the first instance.

Alternatively, the district court indicated in a footnote that "the Medical Settlement similarly prejudiced NRC, voiding NRC's duty to indemnify BP against the BELO claims." But because the BP-NRC Agreement did not contain notice, control-of-defense, or consent-to-settle provisions, it is unclear whether NRC's indemnification obligations precisely track the material breach analysis under the BP-O'Brien's Contract. The single case cited by the district court, arising under Louisiana law, is factually far-afield from the one before us. *Hiern v. St. Paul-Mercury Indem. Co.*, 262 F.2d 526, 528–29 (5th Cir. 1959) (involving allegations that an indemnitee's "failure to act, after promising it would do so, permitted [a] co-indemnitor to dispose of misappropriated assets while [the indemnitee] was

---

directed against BP. *See generally In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, ECF No. 21406, 2016 WL 4091416 (E.D. La. Aug. 2, 2016) [hereinafter "August Order"]; *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179, ECF No. 15853, 2016 WL 614690 (E.D. La. Feb. 16, 2016).

In fact, the August Order illustrates how a responder might fail to establish a "derivative immunity defense," and thus at least potentially fall within the relevant indemnity clause here. August Order, 2016 WL 4091416, at *9 (finding a "genuine dispute as to a material fact as to whether [a responder] complied with an applicable and relevant federal regulation or directive during the response[]" based on allegations that the responder "supplied [a plaintiff] with no [personal protective equipment]," as required by the Occupational Safety and Health Administration's Hazardous Waste and Emergency Response Standard).

making repeated representations that it was doing and would be [doing] everything possible to secure these assets . . ."). The district court must carefully reassess the BELO claims under the BP-NRC Agreement pursuant to Texas law.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment as follows: (1) BP is an additional insured under the relevant policies only to the extent required to meet the BP-O'Brien's Contract's $2,000,000 CGL insurance requirement; and (2) BP materially breached the indemnity provisions under the BP-O'Brien's Contract with respect to BELO claims, excusing O'Brien's from performing its indemnification obligations under the contract for those claims.

We REVERSE the judgment as follows: (1) The Starr and COPS policies cannot be combined to satisfy the BP-O'Brien's Contract's $2,000,000 CGL insurance requirement; together they constitute $1,000,000 in CGL-type coverage; (2) Determining whether BP materially breached its obligations under the BP-O'Brien's Contract with respect to opt-out B3 claims requires factual development on a claim-by-claim basis; (3) Similarly, the district court must evaluate NRC's indemnification obligations for opt-out B3 and BELO claims under the BP-NRC Agreement on a claim-by-claim basis.

This case is REMANDED to the district court for further proceedings consistent with this opinion.[28]

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

[28] These holdings should not be read to limit the ability of the parties to raise on remand other arguments not at issue in this appeal.

No. 20-30364

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting in part:

I respectfully dissent from Section II.B.2 of the majority opinion. Because I conclude BP materially breached the BP-O'Brien's indemnity agreement for opt-out B3 claims based on the record before us, I disagree with the majority's contention that those claims require factual development. In my view, O'Brien's is not required to indemnify BP on any claims because BP failed to give reasonably practicable prompt notice to O'Brien's. I would therefore affirm the district court on this issue as well.

BP's failure to tender any of the opt-out B3 claims before March 2019 materially breached the notice provision of the BP-O'Brien's indemnity agreement. The notice provision required BP to provide as much detail as reasonably practicable under the facts and circumstances. At the time of the Medical Settlement in November 2012, BP knew that some of the 1,638 opt-out B3 claims were from O'Brien's employees. Because BP wanted indemnity from O'Brien's, it should have immediately tendered the claims with known employer information. And for the claims without known employer information BP should have tendered the entire list of opt-outs to O'Brien's. Then O'Brien's would have had an opportunity to determine which opt-out claims were made by its employees.

BP simply argues that it did not tender the claims because they were "in no shape to be litigated." But the notice provision says nothing about claims being in shape to be litigated. The notice provision directs notice be given with as much detail as reasonably practicable. Whether BP determined some of the opt-outs belonged to O'Brien's in November 2012, or sometime after, is of no consequence.

So, in my view, remand on this issue is unnecessary. The district court would be tasked with individual inquiries on each of the approximately 400 opt-out B3 claims as to whether BP had employer information for those

claims at the time of the Medical Settlement, and if not, when did it have that information. But that information makes no difference because BP certainly breached as to the claims with employer information, and there is no reason it took BP nearly seven years to discover O'Brien's was the employer for the claims without employer information.

It is clear BP breached the notice provision for the claims in which BP had the employer information from the complaints or short form joinder and O'Brien's was in fact identified as the employer. The fact that some of the B3 claims were negotiated in the Medical Settlement and some were opt-outs does not change the duty to notify O'Brien's as soon as the claims were known to belong to O'Brien's. Insofar as BP had the employer information that identified O'Brien's for some of the opt-out claims, I would affirm the district court's determination that BP breached the BP-O'Brien's indemnity agreement on those claims.

As for the claims in which there was no employer information, remand to determine when BP knew the claims belonged to O'Brien's would likely not result in a finding that BP did not breach the notice provision. Although I do not necessarily agree with the district court's factual contention that BP had readily available databases with employer information, I find it difficult to conclude there is any circumstance that would have taken BP nearly seven years to obtain the necessary employer information (if it was not readily available). BP of course disputes that it had employer information readily available, but even so, BP does not state what steps it took to obtain employer information (or that it could *reasonably* take seven years to do so). Because BP had knowledge that at least some of the opt-out B3 claims belonged to O'Brien's, BP should have then been aware that some of the claims without employer information belonged to O'Brien's as well, and attempted to obtain employer information within a reasonable time. *Cf. Ridglea Est. Condo. Ass'n v. Lexington Ins. Co.*, 415 F.3d 474, 477 (5th Cir. 2005) (concluding party

should have been aware of likelihood of damage due to presence of other damage and stating the party should have inspected within a reasonable time to provide reasonable notice of damage).

BP strangely argues O'Brien's should have known which opt-outs belonged to it because O'Brien's was a party to the MDL and had access to the list of opt-outs. But that argument ignores the fact that BP didn't notify O'Brien's it would seek indemnity of *any* B3 claims. Certainly O'Brien's would know which claims were brought by its own employees. That, however, does not negate the important point here—BP did not notify O'Brien's that it would seek indemnity of those claims. O'Brien's knowledge of which opt-out B3 claims were from its own employees is just that. It does not also give O'Brien's notice that BP would seek indemnity on those claims.

BP's argument also emphasizes my qualm with what is reasonably practicable notice. If O'Brien's could have "unquestionably" determined in 2012 which of the opt-out B3 claims were brought by its own employees, and BP was going to seek indemnity for any claims that belonged to O'Brien's, why didn't BP notify O'Brien's at that time? It would have been reasonably practicable in November 2012 for BP to inform O'Brien's that "if any of these opt-out B3 claims are from your employees, we want indemnity." O'Brien's would have then known immediately which claims were brought by its own employees (and BP would want indemnification for) and could have shared that information with BP. Instead of acknowledging this simple and reasonable step it could have taken, BP now contends it acted well within the indemnity agreement's terms by sitting on its hands for nearly seven years before saying a word about these opt-out B3 claims to O'Brien's.

Not only did BP breach the notice provision, that breach was material. Most of the *Mustang Pipeline* factors weigh in favor of concluding BP's breach material. Specifically, O'Brien's was deprived of its benefit of the bargain (to

receive prompt notice), BP cannot compensate O'Brien's for that deprivation, BP cannot cure its breach after so much time has passed, and it does not appear that BP acted in good faith.

O'Brien's was deprived of its right to investigate the opt-out B3 claims from at the latest, November 2012 until March 2019 when they were tendered. Notice requirements afford rights like the right to join in the investigation, to settle a case or claim, and to interpose and control the defense. *See Berkeley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.*, 690 F.3d 342, 348 (5th Cir. 2012). O'Brien's had no notice BP would seek indemnity of these claims and in the interim conducted no investigation while under the impression that these claims would not be tendered. BP's only argument on this is that it is "implausible" to think O'Brien's would investigate these claims while they were stayed or sorted. For the same reasons the majority declines to enter the "but-for" world, I see no need to here. There is no way to know whether O'Brien's would have actually investigated those claims. Regardless, for nearly seven years, O'Brien's was deprived of the opportunity to make a choice on investigating the claims it would ultimately be asked to pay

I also note that opt-out B3 claims were part of the B3 class. BP attempted to settle those claims through the Medical Settlement. BP negotiated with class counsel and reached the terms of the Medical Settlement. And when the opt-out B3 plaintiffs received notice of the Medical Settlement, they determined they would rather pursue their own claims than agree to the present terms. As a practical matter, the terms of the settlement, which O'Brien's had no participation in, certainly affected opt-out decisions. So up until those opt-out B3 plaintiffs actually opted-out, BP controlled the defense, organized the settlement class, and established the procedure for dealing with opt-outs. All without notifying or allowing O'Brien's to participate. Through this lens, it is obvious that BP's breach

was material and BP failed to act in good faith.[1] The harm created by BP excluding O'Brien's from the early part of the litigation of these claims is not erased simply because they ultimately opted out. We cannot know what effect O'Brien's participation in the settlement would have had.

When a plaintiff opts out of a class action settlement, it is necessarily a derivative of the settlement terms. Because O'Brien's was not notified before or during the Medical Settlement that BP was going to seek indemnity of any B3 claims or the potential opt-outs, O'Brien's was excluded from the settlement negotiations, lacked the control of the defense, and had no input on the process for handling those potential opt-outs. BP's breach was material on the opt-out B3 claims to the same extent it was on the BELO claims.

BP shut out O'Brien's throughout the entirety of the litigation of these opt-out B3 claims. For BP to seek indemnity from O'Brien's after years of facing these claims, knowing some belonged to O'Brien's, and having the ability to connect the others to O'Brien's, is absurd. The district court concluded the length of time from the time BP had a list of the opt-outs in November 2012, until the first opt-out B3 claim was tendered in March 2019, was prejudicial to O'Brien's. I see no error in this reasoning. Remand is thus unnecessary.

Because BP's delayed notifying O'Brien's of the opt-out B3 claims for nearly seven years, I would conclude BP materially breached the BP-O'Brien's indemnity agreement. Contrary to the majority, I would affirm the

---

[1] Notably, BP does not seek indemnification for the B3 claims settled in the Medical Settlement. Nor does it seem likely that BP would be able avoid a material breach on those claims settled under the consent-to-settle or notice provisions.

district court on this issue and hold O'Brien's is not required to indemnify BP on any claims.