# Supreme Court of Texas

No. 21-0936

ExxonMobil Corporation,

*Petitioner*,

v.

National Union Fire Insurance Company of Pittsburgh, PA, and
Starr Indemnity & Liability Insurance Company,

*Respondents*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued February 23, 2023**

JUSTICE YOUNG delivered the opinion of the Court.

Justice Lehrmann did not participate in the decision.

The law of this State has long recognized that the terms of a separate contract may be incorporated by reference into an insurance policy if that reference is clearly manifested in the terms of the policy itself. This clear-manifestation requirement, along with the concomitant duty to consult the separate contract only to the extent that the policy

requires it, follows from the rudimentary principle that courts must enforce but not expand the parties' agreement. The question presented in this case is whether an insurance policy incorporates the payout limits in an underlying service agreement. Based on ordinary rules of contract interpretation and our precedents applying the incorporation-by-reference doctrine, we hold that it does not. We accordingly reverse the judgment of the court of appeals and remand the case to that court for further proceedings.

The underlying facts are undisputed and arise from the same incident we recently addressed in *ExxonMobil Corp. v. Insurance Co. of the State of Pennsylvania*, 568 S.W.3d 650 (Tex. 2019). Exxon hired Savage Refinery Services to work as an independent contractor at Exxon's refinery in Baytown, Texas. Their working relationship was memorialized in a service agreement under which Savage promised to obtain at least a minimum stated amount of liability insurance for its employees and to name Exxon as an additional insured.[1] Savage fulfilled this contractual obligation and ultimately procured five different insurance policies. National Union Fire Insurance Company, one of the respondents

---

[1] The relevant provision of the agreement (with all emphasis added) reads as follows:

[Savage] shall carry and maintain in force at least the following insurances and amounts: . . . (2) its *normal and customary Commercial General Liability insurance coverage and policy limits or at least $2,000,000, whichever is greater,* providing coverage for injury, death or property damage resulting from each occurrence . . . . Notwithstanding any provision of an Order to the contrary, [Savage's] liability insurance policy(ies) described above shall: (i) *cover [Exxon] and Affiliates as additional insureds* in connection with the performance of Services; and (ii) be primary as to all other policies (including any deductibles or self-insured retentions) and self-insurance which may provide coverage.

in this case, underwrote two of them—a primary policy for general commercial liability and an umbrella policy.[2] A third policy was underwritten by Starr Indemnity & Liability Insurance Company, the other respondent before us.[3]

As we recounted in *ExxonMobil*, 568 S.W.3d at 652–54, the eventual payout dispute between these parties (and others) arose from a workplace accident at Exxon's Baytown refinery in which two Savage employees were severely burned. The employees sought compensation for their injuries and later settled with Exxon for a collective amount exceeding $24 million. About $5 million of that settlement money came from some of Savage's primary-insurance policies under which Exxon was recognized as an "additional insured," including the primary policy underwritten by National Union, which was exhausted to its limits. Exxon paid the rest of the settlement money out of pocket because National Union and Starr both denied Exxon coverage under their umbrella policies.

Exxon then sued both National Union and Starr for breach of contract, asserting that both had wrongfully denied coverage. What followed was a flurry of summary-judgment motions, largely centering

[2] The parties refer to these two policies as the "National Union Commercial General Liability Policy" and the "Commercial Umbrella Liability Policy." For simplicity, we refer to them as the "primary policy" and the "umbrella policy," respectively.

[3] Starr's policy is a "bumbershoot" policy, which, as Starr explains, is a marine insurance policy similar to a land-based commercial general liability policy that operates as an umbrella to one or more different underlying policies. As the court of appeals noted, "the Starr Bumbershoot Policy is an umbrella policy." 658 S.W.3d 305, 319 (Tex. App.—Houston [1st Dist.] 2021) (internal quotations and citations omitted).

on Exxon's status as an "insured" under those umbrella policies and whether Exxon's service agreement with Savage otherwise limited its entitlement to further policy proceeds. The trial court ultimately sided with Exxon, ruling that National Union (but not Starr) was obligated under its umbrella policy to reimburse Exxon for the roughly $20 million it had paid in settling with the two injured employees.

National Union appealed and maintained that Exxon was not insured under its umbrella policy. The court of appeals agreed with National Union and reversed. 658 S.W.3d 305 (Tex. App.—Houston [1st Dist.] 2021). The court concluded that the umbrella policy incorporated the primary policy's limits and that the primary policy in turn incorporated the limits of the underlying service agreement, which (as relevant here) required only commercial general liability insurance of a specified minimum amount. *Id.* at 318. Thus, the court of appeals held, "[b]ecause coverage available to Exxon as an additional insured under the [primary policy], through its incorporation of the Exxon–Savage Contract, makes clear that Exxon's status as an additional insured is limited to primary coverage, Exxon is not entitled to coverage under the [umbrella policy] as an 'additional insured.'" *Id.* For similar reasons, the court affirmed the summary-judgment ruling in favor of Starr. *Id.* at 319–20. We granted Exxon's ensuing petition for review and now reverse.

The general principles of law in this area are well settled. As early as 1886, this Court recognized as "a cardinal principle of . . . insurance law" that "[t]he policy is the contract; and if outside papers are to be imported into it, this must be done in so clear a manner as to leave no doubt of the intention of the parties." *Goddard v. E. Tex. Fire Ins. Co.,*

1 S.W. 906, 907 (Tex. 1886). We have never strayed from this rule. Not long before the turn of this century, Chief Justice Phillips wrote for a unanimous Court that "Texas law has long provided that a separate contract can be incorporated into an insurance policy by an explicit reference clearly indicating the parties' intention to include that contract as part of their agreement." *Urrutia v. Decker*, 992 S.W.2d 440, 442 (Tex. 1999) (citing *Goddard*, 1 S.W. at 907).

Our more recent cases follow the same paradigm. *In re Deepwater Horizon* reiterated that "we rely on the policy's language in determining the extent to which, if any, we must look to an underlying service contract to ascertain the existence and scope of additional-insured coverage." 470 S.W.3d 452, 462 (Tex. 2015) (citing *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 668–69 (Tex. 2008)). And in our first case addressing this very accident, we adhered to the same "well-settled contract-construction principles" and rejected an insurer's attempt to nullify a subrogation waiver in a workers'-compensation policy by invoking unincorporated terms in the underlying service contract. *ExxonMobil*, 568 S.W.3d at 657, 662. "Other than defining who and where by reference to an extrinsic contract," we said, "no other limitations are referenced, incorporated, or contemplated by the policy language." *Id.* at 660.

Together, these and other cases reflect three basic principles for interpreting the meaning of an insurance policy: we begin with the text of the policy at issue; we refer to extrinsic documents only if that policy clearly requires doing so; and we refer to such extrinsic documents only to the extent of the incorporation and no further. Any venture beyond

5

the four corners of an insurance policy must be carefully limited to the scope of that policy's clearly authorized reference.

The proper inquiry here, therefore, must begin with National Union's umbrella policy, the relevant text of which provides as follows:

> Insured means: . . . any person or organization, other than the Named Insured, included as an additional insured under Scheduled Underlying Insurance, but not for broader coverage than would be afforded by such Scheduled Underlying Insurance.

This text invites two limited and targeted inquiries: (1) who is insured and (2) for what coverage?

As to the first inquiry, the umbrella policy expressly covers "any person or organization" that is "included as an additional insured under Scheduled Underlying Insurance." The umbrella policy's definition of "Scheduled Underlying Insurance" includes National Union's primary policy and thus refers to the primary policy to determine who qualifies as an "additional insured." The primary policy, in turn, covers "[a]ny person or organization" to which Savage is obligated by "any contract or agreement" to provide insurance. It is for this limited reason that Savage's underlying service agreement is relevant: it is the "contract or agreement" that obligates Savage to provide insurance for Exxon. None of this should be a surprise. National Union has *already* recognized Exxon as an additional insured under its primary policy. By incorporating the primary policy for the limited purpose of identifying who is an insured, the umbrella policy also insures Exxon.

But the umbrella policy does not insure Exxon for all purposes, of course. We thus turn to the second inquiry that the umbrella policy's

6

reference to the primary policy invites. Specifically, the umbrella policy disclaims "broader coverage" than the primary policy offers, thereby preventing Exxon from demanding that National Union pay for losses that the primary policy would not reach. Exxon does not demand "broader coverage" in this sense. It seeks only the *same* coverage as the primary policy but at the umbrella policy's higher limits, given that the primary policies have been exhausted.

The court of appeals and National Union, however, perceive the umbrella policy's disclaimer of "broader coverage" as playing the far greater role of incorporating the payout limits of the *service agreement*. For several reasons, we must disagree. First, the umbrella policy does not say anything at all, even by reference, about the service agreement's *payout limits*, much less with the clarity that our cases would require for incorporation.[4] *See ExxonMobil*, 568 S.W.3d at 657 (authorizing the use of extrinsic documents only "to the extent required by the policy" (citation omitted)); *Deepwater Horizon*, 470 S.W.3d at 460 ("Unless obligated to do so by the terms of the policy . . . we do not consider coverage limitations in underlying transactional documents.").

---

[4] The court of appeals concluded otherwise through a multi-step process. First, the court of appeals reasoned that even though the umbrella policy "did not expressly incorporate the Exxon–Savage Contract by reference" (and, indeed, the umbrella policy does not reference the service agreement at all), it did incorporate the primary policy, "and the limits of coverage for Exxon as an additional insured under the [primary policy], in turn, were *informed by* its incorporation of the Exxon–Savage Contract." 658 S.W.3d at 318 (emphasis added). National Union correctly notes that incorporation requires no "magic words" to be effective. The "informed by" standard employed by the court of appeals, however, highlights the misstep in its analysis, which did not include what our precedents require: finding a "clear manifestation" for incorporation by reference. *E.g.*, *Deepwater Horizon*, 470 S.W.3d at 460.

7

Second, to the extent that we *could* read the umbrella policy to reference the service agreement in this way, we find no limits in it that the umbrella policy could adopt. The service agreement provides for a *minimum* amount of insurance, not a maximum. *See supra* note 1 (quoting the service agreement's terms). Whether Savage *had* to buy as much insurance as it did is beside the point. What matters is that it *did* obtain that insurance.

Third, the primary policy has its own payout limits, of course. Such limits in primary policies are the very reason that parties need umbrella policies. National Union argues, and the court of appeals held, that the umbrella policy's "limiting clause" would be "meaningless" if Exxon could recover under it, given that it has already exhausted the primary policies. 658 S.W.3d at 318. Interpreting "broader coverage" to refer to payout limits, however, would give the umbrella policy a self-defeating meaning, as an umbrella policy springs into action only when the primary policy is exhausted. We could embrace such a result only if the language the parties used clearly required it. But no such language exists here, and there is no need to save the umbrella policy from "meaningless" language by adopting a construction that renders the *policy itself* largely meaningless. If "coverage" instead refers to the risks and liabilities that the primary policy reaches—and not any other kind of risk or liability—then the umbrella policy's limiting language protects the insurer from claims that are unlinked to the applicable primary policy.

This conclusion follows from conventional usage of "coverage" and "umbrella insurance." The former contemplates the *risks* covered, and

the latter is triggered only by reaching the *limits* of other policies.[5] National Union points us to no authority providing that "coverage" must include payout limits in this context. Its own umbrella policy, in fact, distinguishes between "coverage" and "limits."[6] In short, the contractual text before us does not require departure from the settled understanding that umbrella policies provide greater limits for *the risks already covered* by primary policies.

In a similar vein, National Union argues that the umbrella policy incorporates the service agreement beyond merely identifying "who" is insured because the primary policy expressly says that an "additional insured" is someone to whom Savage is contractually obligated to furnish insurance "of the type provided by this policy." Because the service agreement obligates Savage to provide Exxon only *primary* insurance, National Union contends, Exxon is entitled to nothing more.

---

[5] *E.g.*, *Coverage*, Black's Law Dictionary (11th ed. 2019) ("[T]he risks within the scope of an insurance policy."); *umbrella policy*, Black's Law Dictionary, *supra*, (defining "umbrella policy" as an "insurance policy covering losses that exceed the basic or usual limits of liability provided by other policies"); *Evanston*, 256 S.W.3d at 667 (recognizing that an umbrella policy did not "extend beyond what the underlying [primary] policy provides" and looking to whether coverage extended to "sole negligence"); *Traders State Bank v. Cont'l Ins. Co.*, 448 F.2d 280, 283 (10th Cir. 1971) ("The word coverage is, indeed, a term of art in the insurance industry, meaning the sum of all the risks assumed under the policy." (internal quotation omitted)); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1176 (D.C. Cir. 2003) ("[T]he word 'coverage' . . . usually refers to the inclusion or exclusion of specific risks under an insurance policy.").

[6] The umbrella policy's first page, for instance, provides that National Union "agree[s] to provide coverage as follows," and then lists "occurrences" such as "bodily injury" and "property damage" "arising out of [Savage's] business." On the same page, the policy provides that "[t]he amount we will pay for damages is limited as described in Section IV. Limits of Insurance."

This contention, however, again violates the settled principles that we have described above, in which we start with the umbrella policy and refer to other documents only to the extent that the policy authorizes. Whether the umbrella policy provides the same "type" of insurance as the primary policy is immaterial to our decision[7] because National Union's argument based on that word would require us to look to terms in extrinsic documents that the umbrella policy did not incorporate. The umbrella policy requires knowing whether the insured was covered by the primary policy, as Exxon was; the umbrella policy does not further incorporate the primary policy's various provisions or definitions. The umbrella policy makes no mention of the "type" of insurance provided or even what was minimally required by the service agreement. We therefore need not look to the primary policy or service agreement to determine matters outside the terms of the umbrella policy.

*   *   *

For these reasons, we hold that Exxon is an "insured" under National Union's umbrella policy and therefore reverse the judgment of

---

[7] Nor do we regard the argument as one that would likely affect the outcome regardless. National Union itself has described the umbrella policy as a "Commercial Umbrella Liability Policy," which is consistent with our conclusion that the umbrella and primary policies do not differ in their coverage—that is, they cover the same *type* of risks. It is also consistent with how the Fifth Circuit understands commercial general liability policies in similar contexts. *See, e.g.*, *O'Brien's Response Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*, 24 F.4th 422, 429–30 (5th Cir. 2022) ("The bumbershoot policies provide CGL-type coverage, so they are best understood as CGL policies . . . ."); *see also id.* at 428 & n.7 (noting that a contract "required . . . four types of policies": CGL as well as "[w]orkers' compensation, employer's liability, and automobile liability insurance"). We reserve for a future case in which it would be dispositive, however, what "type" means when used in this context.

the court of appeals as to National Union. Because the court of appeals' holding with respect to Starr's bumbershoot policy was predicated on a similar error, we also reverse the judgment below in favor of Starr. We accordingly remand the case to the court of appeals for further proceedings.[8]

Evan A. Young
Justice

**OPINION DELIVERED:** April 14, 2023

---

[8] We express no view of Starr's distinct arguments, including those antecedent to the issue of priority of coverage, such as whether the claims against Starr have been preserved or whether there are other substantive reasons that Starr's bumbershoot policy does not cover the claim at issue. All issues other than the construction of National Union's umbrella insurance policy remain open on remand, and the court of appeals should address any properly preserved issue in the first instance.